IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CASE NO. 4:23-CR-00360-5 |
| | § | HOUSTON, TEXAS |
| VERSUS | § | WEDNESDAY, |
| | § | AUGUST 30, 2023 |
| HARRY KEITH DWYAN GOFFNEY | § | 3:16 P.M. TO 4:06 P.M. |

**DETENTION HEARING (VIA ZOOM)**

BEFORE THE HONORABLE ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:                          SEE NEXT PAGE

ELECTRONIC RECORDING OFFICER:    VANESA ARANDA

COURTROOM CLERK:                 RUBEN CASTRO


TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
mary@judicialtranscribers.com


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.


JUDICIAL TRANSCRIBERS OF TEXAS, LLC

APPEARANCES (VIA ZOOM):


FOR THE PLAINTIFF:              US ATTORNEY'S OFFICE
                               Kelly Zenon-Matos
                               1000 Louisiana St., Suite 2300
                               Houston, TX  77002
                               713-567-9000



FOR THE DEFENDANT:             LAW OFFICE OF ROMY B. KAPLAN
                               Romy Benjamin Kaplan
                               5300 Memorial Dr., Suite 750
                               Houston, TX  77007
                               281-969-3725


ALSO PRESENT:                  PRETRIAL SERVICES
                               Karen Barrientos

                                    INDEX


EXHIBITS:                           Marked    Offered    Received

GOVERNMENT'S:
Ex. 10                                          8
Ex. 11                                          8
Ex. 12                                          8
Ex. 13                                          8
Ex. 14                                          8
Ex. 15                                          8
Ex. 16                                          8
Ex. 17                                          8
Ex. 18                                          8
Ex. 19                                          8
Ex. 20                                          8


                            ***

**HOUSTON, TEXAS; WEDNESDAY, AUGUST 30, 2023; 3:16 P.M.**

THE COURT:  Good afternoon.  This is the United States District Court for the Southern District of Texas, Judge Andrew Edison presiding.  We're here on Case 4:23-CR-360-5, *United States versus Harry Keith Dwyan Goffney.*  Who do we have for the Government?

MS. ZENON-MATOS:  Yes, Your Honor, good afternoon.  Kelly Zenon on behalf of the Government.  And we are ready to proceed.

THE COURT:  Hello.  Good to see you.

And for the Defendant.

MR. KAPLAN:  Romy Kaplan for Mr. Goffney.

THE COURT:  Hello, good to see you.

And hello, Mr. Goffney.

Okay.  We are here for the resumption of a detention hearing.  I just wanted to make sure I confirm that we've already taken care of the arraignments and the *Brady* order.  So we are here for detention hearing.

Now, just so we're on the same page -- and I got to be honest, we've done a bunch of these in the last few days, I want to make sure we're on the same page.  If I remember correctly -- if I'm wrong just I know neither side will hesitate to tell me I am wrong.  This happens from time to time.

I think we read the proffer in with respect to

Mr. Goffney. And then we basically excused you, Mr. Kaplan, and said, hey, when we come back, we will resume with the witness on the witness stand for full cross-examination.

MR. KAPLAN: The witness will proffer testimony, yes.

MS. ZENON-MATOS: (Indiscernible) cross-examine him then he's available (indiscernible) I don't know if he would like to do that.

MR. KAPLAN: I'm sorry. My understanding is I got to actually examine special agent or detective (indiscernible) when we were here, and the Government had passed on their case and so I --

THE COURT: That's right. Okay. So, okay, my apologies. Let me step back. Let me start over. And I appreciate you bringing that up.

What happened is we had other defendants here as well. We did the direct -- or we had the proffer that was made. We entered into exhibits into the record, which would have been Exhibits 1 to 12.

MS. ZENON-MATOS: That -- we have a confusion regarding that. We have been trying to get into an agreement because we have continued numbering the exhibits, including in this hearing yesterday. We tried (indiscernible).

THE COURT: No, correct, but I say when Mr. Kaplan

and his client left, we were one through 12 had been entered into evidence.

MR. KAPLAN:  No, we were one through nine.  And I'll try to put it this way.  One through nine was admitted, the last exhibit being the proffered testimony of Mr. Bach (phonetic).  And the previous exhibits, they are images one through eight, were a combination of pictures and such that have already been admitted into the record.

I have been given today some similar, some different images and exhibits that the Government wishes to admit.  In an abundance of trying to make this incredibly easy, my solution is we pick up from where we left off, which was beginning with Exhibit 10 that the Government is going to try -- the Government is going to proffer and admit for you to determine.

I will say, though, that I know, for example, that one -- several of the images are repeats but some of them are new.  And so what I would suggest to the Court is if we just started with exhibit -- Government's Exhibit 10 and just proceed from there so that way all the exhibits and the record are clear.

MS. ZENON-MATOS:  Your Honor, for the record, what we did was to separate exclusively the exhibits that pertain to Mr. Goffney and started from scratch, just to avoid what we had yesterday, the missteps regarding the exhibits.

But counsel apparently wants to refer to exhibits that were presented on the first day, so we're suggesting to continue that numbering.

THE COURT:  Do I -- is there a copy for me --

MS. ZENON-MATOS:  Yes.

THE COURT:  -- of what you would like to introduce into evidence?

MS. ZENON-MATOS:  Yes.  But if he suggests (indiscernible) to continue the numbering from number ten, I will have to surely just renumber them.

THE COURT:  Let me ask you this.  Can you give me --

MS. ZENON-MATOS:  Yes.

THE COURT:  -- a copy of just the exhibits --

MS. ZENON-MATOS:  The ones from today.

THE COURT:  -- that you want to introduce?  And you've given Mr. Kaplan -- let me ask you this.  We'll worry about the numbers in a minute.

MS. ZENON-MATOS:  Yes.

THE COURT:  Is there any objection, Mr. Kaplan, to having these documents, at least for the purpose of this hearing, not any other hearing in the case but just for the purpose of the detention hearing?

MR. KAPLAN:  For them to be admitted, no objection, Your Honor.

THE COURT:  Okay.

MR. KAPLAN:  My objection just as long as they each exhibit is individually -- even if they are --

THE COURT:  I understand.  Okay, --

MS. ZENON-MATOS:  These are starting from number ten (indiscernible).

THE COURT:  Okay.

MS. ZENON-MATOS:  Just a copy for the Court.  So ten to 19, Your Honor.

THE COURT:  Okay.  I'm worried that I'm going to create more problems.

MS. ZENON-MATOS:  I know --

THE COURT:  Wait, here's what I'm going to do, okay, so the record is clear.  We had previous Exhibits 1 through 9 that were entered into evidence the other day, which is a bunch of documents the Government wanted entered and then the proffer.  Those are in evidence.

In addition, what has just been handed to me is Exhibits 10 through 19.

MS. ZENON-MATOS:  Nineteen.

THE COURT:  Those are in evidence.

(Government's Exhibits 10, 11, 12, 13, 14, 15, 16, 17, 18, and 19 were received in evidence.)

And then I'm going to add Exhibit 20 is going to be the pretrial report for Mr. Goffney.

(Government's Exhibit Number 20 was received in evidence.)

So for the purposes of Mr. Goffney's hearing, we are all in agreement that there are 20 exhibits; one through ten as I -- one through nine that were talked about or introduced the other day, 11 through 19 that have now been introduced and I've admitted for the Government.  And number 20 is the pretrial report for -- now that we've gotten the difficult stuff out of the way, --

MS. ZENON-MATOS:  And, Your Honor, we would just --

THE COURT:  -- I think we're ready --

MS. ZENON-MATOS:  -- ask for two minutes to renumber them so they come out (indiscernible) not confused.

THE COURT:  Absolutely.  And just so we're aware, so were we -- now I recall.  The Government had said they had no further -- the witness had stepped down, the Defendants were starting to examine, and you wanted some time, and I said, yes.  So now we're back here.

So I guess my real question is so where do we start off here today?  Because it sounds like you have something you'd like --

MS. ZENON-MATOS:  Have additional exhibits so we will have the agent recognizing and explaining those exhibits only because he already testified as to the facts. If you want to be cross-examined, he's available.

THE COURT:  So, Mr. Kaplan, I think it -- at least my thought is why don't we just let the witness back on, he'll add anything else, and then if you want to cross-examine him on that stuff, and then let you go forward?

MS. ZENON-MATOS:  Your Honor, I can also proffer the content of the exhibits.

MR. KAPLAN:  I'll say this, the Government did pass their case and it was now the Defendant's case (indiscernible) after the State had passed theirs.  I had already spoke to the agent that had testified.  I have already admitted and agreed to the new exhibits coming in.

I have -- I'm not going to tell the Government what to do if they wish to have him testify and go into that, so be it.

THE COURT:  Well, let me ask this.  Should we go through the exhibits?  And if you need a minute first to renumber them.

MS. ZENON-MATOS:  Yes.

THE COURT:  Okay.  Let's -- here's what -- we're going to take a quick break.  But here's (indiscernible) instead of just bringing the witness up and going through what are these, just have you tell me what they are.

MS. ZENON-MATOS:  Perfect.

THE COURT:  What is it and why is it important?

MS. ZENON-MATOS:  Totally in agreement.

THE COURT: Okay. We'll take a quick break just to let you number it so we have all those numbers.

MS. ZENON-MATOS: Thank you, Your Honor.

THE COURT: And just let me know when you're ready. I'm not going anywhere.

(Judge/Clerk confer.)

MS. ZENON-MATOS: We're ready, Your Honor.

THE COURT: Bear with me. Okay. Let's go back on the record. And if you could just you don't mind walk through with me the additional documents, 11 to 19 that have been entered into evidence that the Government -- sorry, ten to 19 that the Government has entered into evidence. And if you could just walk through those and tell me why each document's important.

MS. ZENON-MATOS: Yes, Your Honor. For the proffer of the Government, Exhibit 10, which is the first exhibit of the new package we provided to counsel today, that exhibit is from August the 7th, 2023, the day of the rip and it depicts the four individuals, including Defendant Harry Keith Dwyan Goffney, talking to the CS where he was -- and they were all explained the instructions about how the robbery was supposed to take place, including the amount of kilograms of cocaine, 30, and 400 -- approximately 400 firearms that were going to be in the trailer in the next location. And they were explained the whole plan. And we

can see Defendant Goffney in that image. And that is Exhibit Number 10. And that exhibit was presented in the first day.

THE COURT: I'm not worried about whether -- but just go through each one.

MS. ZENON-MATOS: Okay.

THE COURT: Okay. Number 11.

MS. ZENON-MATOS: Exhibit Number 11 is a screenshot of the surveillance showing once again the four defendants that participated in the rip. Defendant Goffney is depicted pointing a rifle at the right side of the image.

THE COURT: Okay.

MS. ZENON-MATOS: Defendant -- Exhibit Number 12 are three images also of the four individuals in front of the trailer, and Defendant Goffney's depicted in the first image to the left with a rifle, and in the image to the right turning his back to the camera.

Exhibit Number 3 -- I'm sorry, Exhibit Number 13 is the contact of Mr. Goffney that was found in the cellphone, a search of the cellphone of codefendant Martez Tyrel Foley. And that particular contact depicts the number, the phone number for Mr. Goffney. And I'm reading that number: eight, 32, eight, 67, two, zero, 51.

That contact was found in the phone number of Martez Tyrel Foley. And the search of that cellphone of

Martez Tyrel Foley was done after we (indiscernible) search warrant.

Exhibit Number 14 are screenshots of the search of the conversations between Mr. Martez Tyrel Foley, Defendant Number 4, and this Defendant, Harry Keith Dwyan Goffney, based on the number that was found on that phone.

Essentially this Exhibit 14 depicts an image of a firearm with what we call a Mickey Mouse magazine and -- excuse me, Your Honor.  Okay.  So we can clarify that what is in blue is Martez Tyrez (sic) Foley asking Mr. Stevenson that -- I'm sorry, Mr. Goffney that had sent the image that he wants something like that.

And also Mr. Foley is asking Mr. Goffney if he's selling some switches that based on our understanding refers to automatic, you know, switches to turn a firearm into the automatic mode.  And for the record, that exchange regarding the switches happened on June the 7th.

MR. KAPLAN:  Your Honor, briefly, I'm sorry to interrupt, Kelly.  Exhibit 14 also mentions underneath this image that some image or message was unsent.  So --

THE COURT:  I see it.

MR. KAPLAN:  -- my question is if it was unsent, that mean that Mr. Goffney might not have received it if it was unsent by Defendant.

MS. ZENON-MATOS:  No, Mr. Goffney is the one

sending the picture.  Apparently he tried to take it back but it had been received already because we found it in the phone of Mr. Foley.  So he couldn't take it back.  So that's what prompted the comment.

THE COURT:  Got it.

MS. ZENON-MATOS:  Exhibit Number 15 are additional conversations regarding the firearm, particularly we have a conversation that we want to highlight or a comment that we want to highlight on August the 7th which was just pretty much the same date -- excuse me, Your Honor.

To clarify, that was the day -- exact the day of the rip.  And essentially Mr. Foley is sending a message to give to Mr. Goffney essentially stating you need to bring an extra strap, which based on the officer -- and we can proffer that his testimony was going to be that an extra strap is a gun, an extra gun.  And obviously we propose to the Court that it was directly related to what was about to transpire.

Exhibit Number 16 are in messages between Mr. Foley and Mr. Goffney.  Again, we have pictures of firearms there.  And we have Mr. Foley pretty much asking Mr. Goffney what's the ticket, which is essentially what is the price for the firearms.  And the response of -- was we're proposing that was Mr. Goffney is that six and he only has two switches.  And referring to switches turning

firearms into the automatic load.  And that was Exhibit 16.

Exhibit 17 is a message that was sent by Mr. Goffney to Mr. Foley with a picture of a firearm and a dollar sign pretty much stating $200.

And then Mr. Foley is pretty much replying saying to hold that for him because he had just paid parole.  And that is relevant because in the hearing of Mr. Foley, indeed he was or had been on parole previously.  So we believe that he corroborates that it was a conversation between both of them.  And that was Exhibit Number 17.

And the last two exhibit, Your Honor, we have Exhibit Number 18, the agents had access during the course of this investigation that did not start on August, start way before, to the public Instagram -- or, I'm sorry, social media page, Instagram page/Facebook, it's the same company, of Mr. Harry Goffney.  His name and social media is Playa Harold (phonetic).

And we can see Mr. Goffney pointing what seems to be a real firearm and he -- if the Court examines one of the pictures of the exhibits, particularly Exhibit Number 14, we can see that it appears to be the same firearm with what we call the Mickey Mouse magazine.

And the last exhibit, Exhibit 19, is another -- and, I'm sorry, as to Exhibit 18, I do want to clarify that that was taken or posted at least on February 18, 2022, last

year.

And we have the last picture at Exhibit 19.  That is an additional picture that we found in the social media page, at that time a public page, of Mr. Harry Goffney. That was posted on (indiscernible) 2022.  And we could see him holding two firearms, one clearly with that extended magazine, and the one in his lap also has an extended magazine.

Obviously we have not come into the possession of the firearms.  But it doesn't seem to be a game.  They appear to be real firearms.  Those are the exhibits that the United States is offering for purposes of this hearing.  And our agent here available to be cross-examined if brother counsel wants to do so.

THE COURT:  Okay.  Let me ask some quick questions.  I understand the first few pictures are intended -- just want to make sure I understand why these photos are being offered.  The first group is intended to offer to show that Mr. Goffney was actually there, was a active participant, and then --

MS. ZENON-MATOS:  Was an active participant and was carrying particularly the long weapon that was carrying that day.

THE COURT:  Got you.  And then the others generally speaking show that he is engaged in various

correspondence, communication regarding the sale of weapons and these photos with  him and he weapons.

I assume, and tell me if I'm wrong or missing something, It's to show that he is at least in the Government's eyes a danger to the community because he's having these weapons, he's pointing these weapons, and that that's something the Court should take into account.

MS. ZENON-MATOS:  Yes.  And another also connection and his connection with a co-participant in this case, which is Mr. Foley obviously.  And those are the two reasons, Your Honor.

THE COURT:  Okay.  So now the Government has rested its case.  Mr. Kaplan.

MR. KAPLAN:  I have no questions of the agent.  I wish to present the Court a proffer with regards to his ability to abide by conditions of pretrial bond that the Court would hopefully grant and the fact that he's not a danger to the community.

THE COURT:  Okay.  I'll let you make whatever proffer.  My only request is we'll be arguing in a second so this is just --

MR. KAPLAN:  I understand.

THE COURT:  -- the proffer.

MR. KAPLAN:  Yes, Your Honor.

THE COURT:  Who's the proffer of, who's the --

MR. KAPLAN:  The proffer is of Dejanae Butler (phonetic).  All right.  Dejanae Butler is his girlfriend and the mother of his two children.

If called to testify, she would testify about how important Mr. Goffney is to their day-to-day lives, how much of a caretaker he is to both her family and his, and that his absence from the home has posed a challenge and a detriment to the child care situation and to his children's upbringing.  The --

THE COURT:  Let me just ask you.  I hear you loud and clear.  Why does that matter to this proceeding?  Meaning the question is, is he a danger to the community and are there conditions that I can impose.  He could be a great dad, he could be a terrible dad.  I don't think that has anything to do with whether I should hold him in custody or should release him.

MR. KAPLAN:  Because the Court is tasked with determining a set of conditions that would reasonably assure the public safety but also assure the appearance on bond.  And I'm trying to establish that there are conditions this Court can impose to establish safety of the community while he can maintain being a caretaker and a father to his children at the same time.

THE COURT:  Okay.  I'm not sure I -- I guess what I'm really saying is at the end of the day, I've got to

decide are there conditions I can impose to alleviate the risk of harm or danger to the community?

MR. KAPLAN:  And the answer is, yes, Your Honor.

THE COURT:  Okay.  But I don't think -- I know I'm going into a little rabbit trail but I don't think that has anything -- I mean if, you know, nice to know, nice to hear if someone's a good --

MR. KAPLAN:  It does, Your Honor, because it does go to he's not a danger to the community, that he is -- his role and the presence at home is necessary for the upbringing and maintenance of not only his family, his mother, but also that of Dejanae Butler and her family and their children together.

So there are conditions that the Court can impose to ensure the public safety while he is able to be out on bond as the Court has indicated multiple times that that is the norm, that he could be ordered, for example, to be able --

THE COURT:  Go into the proffer, let's do the proffer.  That's my fault.  I apologize for going down that rabbit trail.

MR. KAPLAN:  So the proffer is, Your Honor, is that, as I was saying, Ms. Butler would testify that her hours are so strict at work that Mr. Goffney drops off Ms. Butler at her work, then takes that car and takes their

15-month-old to daycare, while he is at home watching the five-month-old, helping him not only to -- with the five-month-old's upbringing but also helping with Ms. Butler's family and that of his own.

His mother and his grandmother are ill and infirmed. They have disabilities they require and they need his help to help provide food, just getting around, and being caretaker to tend to all of their needs as well. He's able to -- he would be able to do that at home.

One of the conditions that I would ask the Court to impose is that 24-hour home confinement with the exception that he be allowed to take his children to daycare and drop Ms. Butler off at work so that the family could still have income and revenue and that way would allow for the family unit to continue to function; because right now, Your Honor, family is not able to function as well.

Right now the older child that is in daycare is not able to go because Ms. Butler's not able to adjust her work schedule to allow the drop-off and pickup according to the strict times of the school.

And that Mr. Goffney is also taking care of his mother but also his grandmother, in addition to helping out with Ms. Butler's grandmother as well who is infirmed as well.

I would like to point out while I'm here, Your

Honor, the four people sitting here in the front row are all supporters and family members of Mr. Goffney, and so they are here to show the Court his support and you of how much they trust and rely upon him for their day-to-day and how integral he is and how they will also take responsibility for his appearance -- for his ability to appear in court and abide by the conditions that the Court will hopefully impose.

That currently at the home right now is Ms. Butler, their two children, and Ms. Butler's grandmother as we talked about as he is a caretaker for her as well and their two children.

And on behalf of the family they're asking that he be allowed to come home, to fight this case out on bond and continue to be the father that he is and the family member that is needed for two different families.

And that the Court can impose conditions to allow them to continue to do that. And that is the evidence that I would proffer, Your Honor.

THE COURT: Okay. Thank you very much.

Let's have argument, Government first, defense second.

MS. ZENON-MATOS: Yes, Your Honor. In this case, as the Court always requests, the Government in this case is arguing both risk of flight and danger to the community.

Obviously as the Court always acknowledges and knows, this is a presumption case.  We don't believe that the proffer provided by brother counsel has rebutted either of the presumptions.

And we're going to start with a risk of flight.  In this case, Your Honor, we have a defendant with a criminal history of evading arrest, failing to ID, and having his probation of only three years revoked --

MR. KAPLAN:  Your Honor, I'm sorry.  I'm -- I --

THE COURT:  Wait, wait, wait, let me ask this.  What do you mean he's evading arrest?

MS. ZENON-MATOS:  There -- one of his conditions, Your Honor, and let me make sure that I'm --

THE COURT:  Wait, wait, hold on, hold on.

MS. ZENON-MATOS:  I'm referring to --

THE COURT:  Are you 3/31/17, --

MS. ZENON-MATOS:  Yes.

THE COURT:  -- some sort of evading arrest charge --

MS. ZENON-MATOS:  Yes.

THE COURT:  -- and adjudicated to 20 months probation.

MS. ZENON-MATOS:  Yes.

MR. KAPLAN:  And that is my objection, Your Honor.

THE COURT:  I'll let you argue later on.  Let me

hear her.

Okay.  So one was evading arrest.  What else?

MS. ZENON-MATOS:  And we are now going to make reference to the next case, Your Honor, where the Pretrial Services Report details that the Defendant first in 2019 was sentenced only to three years probation, and the Defendant in August 8, 2019 failed to appear.

And then short time later a motion to revoke probation was presented and it was granted and he was sentenced to eight months of confinement.  We believe that that goes directly to risk of flight.

And, Your Honor, when we compare the Defendant ignored the conditions imposed by the Court in a sentence of only three years probation, in this case, Your Honor, the Defendant is facing 15 years combined, ten years for the conspiracy and five years for the firearms.  That's the minimum term he can get if he goes to trial and gets convicted.

If he jumps his conditions only when he was sentenced to three years probation, we believe that this Defendant cannot be trusted, Your Honor, to abide by the conditions of the Court.

As to the proposed custodian, Your Honor, and we're going to be careful here because we provided counsel with a report stating that the proposed third party

custodian, Mr. Goffney's girlfriend, had called the police on him last year.

We're not going to go into the details because we know that the Court doesn't give the same weight to arrests. Even though that is not in the Pretrial Services Report, we did provide the arrest report to counsel.

We are just stating that we highly doubt that based on what we read there and based on the behavior and the actions of Mr. Goffney not just on August the 7th but what we see in here of what he, without any problem, is posting in social media holding firearms with extended magazines, we are highly concerned that his girlfriend can control Mr. Goffney really.

This is the individual that apparently they are proposing that this lady can control. We propose -- and it is our contention that she cannot control this individual.

And the individuals that were seen in the pictures, we are -- and we're pretty much almost jumping to danger to danger to the community. We are very concerned that this individual is residing with children.

And we also want to highlight as to the contributions on Mr. Goffney, Mr. Goffney admitted to Pretrial that he has never worked in his life formally. What contribution is he making to the family? Yeah, I mean, they're proffering that he takes the children to school but,

I mean -- and that is as to risk of flight, Your Honor.

As to danger to the community, and we don't want be repetitive, this is the only defendant in this case that carries a long weapon in this thing.  And even though all firearms are dangerous, I can proffer to the Court that the rifle that Mr. Goffney decided to carry in this operation was (indiscernible) in comparison with a handgun that the other three individuals were possessing.

And I want to make reference to Exhibit Number 11. When we can -- where we can see Mr. Goffney pointing that rifle, and we can propose to the Court that he was ready to fire anyone he would have encountered.  Thankfully that was an operation that was fully controlled by the Federal government and nothing happened.

But as to danger to the community, we believe that this is the strong evidence for the Government.  This was recorded in video and audio.

And we believe that the actions of Mr. Goffney that are detailed in the text messages he was exchanging with codefendant Foley, that clearly (indiscernible) individual directly involved in the selling of firearms.

And his disregard for whatever people think seeing post in this publicly that was real easily acceptable to agents and to everybody in the community, Your Honor, we cannot reach any other conclusion that this individual has a

pattern of dangerous activities.  And he's a danger to the community and a risk of flight and he should be detained, respectfully, Your Honor.

THE COURT:  Why would not -- I'm sure it's the Government's tradition.  Why couldn't I impose some pretty damn strict conditions like home confinement on him?  In other words let me say it.  I share your view on like the pictures, you know.  Obviously the evidence is strong that at least he had this long weapon, he's posting these pictures of guns, you know.

MS. ZENON-MATOS:  Your Honor, our contention is that it goes against his pattern of conduct, Your Honor. This is an individual that even when the Court and counsel can consider his prior, you know, minor convictions because, you know, in one he got, you know, 15 days, and the other 20 months' probation, we see a pattern of violating authority and the instructions imposed by authority.

We have evading arrest, he only got 20 months' probation.  But, again, it's -- that's directly relating to violating instructions of authority.

Failure to identify, again, a person, a law enforcement officer asking to identify, he decided not to do it.

And, finally, in his last conviction in 2019, he's decided to not appear.

So based on his own track record we don't believe that even having Mr. Goffney in his house, if he's the same individual depicted in this pictures, that he is really going to abide by the instructions of this Court. So that is the position of the Government.

THE COURT: Okay. Thank you very much. I appreciate it.

Mr. Kaplan.

MR. KAPLAN: Your Honor, I -- my objection is generally speaking, first off, I have a real problem with the Government using juvenile cases --

THE COURT: I understand.

MR. KAPLAN: -- in pretrial reports. Juvenile justice cases are meant to be different, that as a 14-year-old and as a 15-year-old, that that is somehow appropriate to be considered for making a bond determination, I just -- I have a great objection to.

And then moving on to what happened as a 17-year-old, though technically an adult in the State of Texas, he's still a 17-year-old child, and though an adult, nonetheless he served time as a 17-year-old. And his sentence was discharged and since completed in '20.

Since then, Your Honor, he has grown, he has become a father twice. There are no criminal convictions since he was released from prison. And, as the Government

indicated, they were very minor offenses as a juvenile.

He is now a father of two children.  We have shown the Court that he is not a risk of flight.  He has all that he knows is here in Houston, all that he has is here in Houston.

The Government hasn't indicated that there is a passport, that he has the proclivity to leave town or go traveling.  He's here with his family being a caregiver day-to-day of not only his family but the family of his girlfriend, and how important he is to them.

Again, no charges or violent convictions.  He is not a danger to the community because one of the conditions the Court can impose is no firearms in the home, done.  The Court can impose that he's not allowed to communicate with any of his codefendants or anybody else that the Court wishes to impose those conditions upon.  Those can be satisfied and met.

And, Your Honor, we have -- he is to a danger to the community when he is out -- when he is with his children, taking them to daycare, to a doctor's appointment, taking Ms. Butler's grandmother for medical treatment, taking his -- whatever it might be.

And so one of the conditions that I am going to ask the Court is that he be allowed to take his children to daycare and home, be allowed to remain a caregiver to his

family.  That there are conditions this Court can impose to ensure the safety of the community, the public, and that he remain a member of his family and contributing.

We would love for the Court to allow him to seek employment.  I understand if the Court wishes for him to be home and a caregiver instead of that.  Certainly not object to that.  But --

THE COURT:  Wait, that sounds contradictory.

MR. KAPLAN:  If --

THE COURT:  So --

MR. KAPLAN:  -- the Court wishes to impose that he get a job to contribute, then we'll certainly abide by that.  But we would prefer the Court allow him to be at home to be a caregiver in lieu of.  I just didn't want the Court to think I'm only putting my eggs in one basket.  We are amenable to conditions.

And the fact that we're having these conversations I do hope the Court indicates and allows that he be placed on some sort of bond condition to ensure that his role within his family contributes and his family doesn't suffer as a result of him being in custody.  And I ask the Court place him on a bond with the conditions the Court find appropriate.

THE COURT:  Okay.

MS. ZENON-MATOS:  Your Honor, February 18, 2022

was a Friday.  I imagine he took his children to school and then took this picture, pointing a firearm in a camera.

THE COURT:  Okay.  Thank you all very much.  As usual I really appreciate the presentations and the argument of counsel.

I know counsel here has all heard my little speech at the outset -- at the conclusion of these detention hearings.  But, Mr. Goffney, let me let you hear it.

We are here today on the Government's request you be held in custody pending the trial of this case.

Importantly, there is a presumption of innocence in our criminal justice system.  You are innocent until proven guilty.  And nothing that I say here today in any way, shape, or form is to say you're guilty, you're not guilty.  You're innocent until proven guilty.

My job is simply to see if -- to determine if you should be held in custody pending the trial of this case.

Make no bone about it, they're serious charges that you're facing.  And that's for another day to determine whether or not you are guilty or not guilty of those charges.

Under The Bail Reform Act, which is the Federal law that governs these proceedings, detention is the exception rather than the rule.  Most defendants should be released pending custody.

However, if the Government shows that you are a danger to the community or a risk of flight, and importantly there are no conditions that I can impose to ensure your appearance at trial or the safety of the community, then I'm actually required to hold on in custody pending the trial of that case, whenever it is.

In this case, because of the nature of the crime and the potential sentence, this is what we call a presumption case.  There's a general presumption that you should be held in custody.  And if you were able to rebut the presumption then we sort of go beyond it.

I think that that burden is very light and I think that the proffers that have been offered by your counsel, Mr. Kaplan, have rebutted that presumption.

So the question then becomes are there any conditions I can impose to alleviate a risk of flight or danger to the community.

On the risk of flight issue, the Government has the burden to show by a preponderance of the evidence, that is little more than the not that you aren't going to appear and that, importantly, there are no conditions I can impose to alleviate that threat.

I'll be candid, there's some past history here that is concerning in terms of you not evading an arrest and then failing to appear at a hearing in the past.  I'm not

justifying it all.  I do appreciate and understand Mr. Kaplan's comment, you know, the first one occurred when he was 15.  The other one was 17.  And the second time and as a result, you know, you were sentenced to eight months confinement.

But the reason I don't think the Government's met its burden on risk of flight is I think there's conditions I can impose to eliminate it, meaning I think I can put an ankle monitor on you, I think I can tell you where you've got to be, and I don't think you're going anywhere.

Everything in this (indiscernible) grew up in Houston, according to the pretrial report, born in Houston, raised in Houston, all -- everyone's family is U.S. citizen. He's got his girlfriend, everyone's in Houston.  There's no elsewhere to go.  So I don't think the Government has met its burden on the risk of flight.

I really think this case turns on the danger to the community.  And, look, I'm -- you know, I think it's pretty clear, these pictures are concerning.  You were involved or allegedly involved in a pretty darned serious offense.  You know, running around with weapons is not something to laugh at, take for granted.  It's very serious.

And of course the standard is are there any conditions I can impose to alleviate the risk.  And I think there are conditions I can impose.

So I am going to allow you a release.  But I am going to impose serious conditions.  And it is as follows. You are not to violate any State or Federal, local law while on release.

You must not intimidate or attempt to intimidate a witness, juror, or obstruct justice.

There's going to be a $50,000 unsecured bond that you're going to be required to sign, which means in the event you violate any of these conditions, you're going to be required to pay $50,000.

You're not going to -- you have to report to Pretrial Services.

In addition, I'm going to require that you -- if you have a passport you have to surrender it.  If you don't have a passport, well you can't obtain another passport.

You're to avoid all contact directly and indirectly with any person who's a victim, potential witness, or codefendant in this case.

No possession of any firearm, destructive device, or dangerous weapon, none, period, end of story.

You are to have no excessive use of alcohol, no drug possession, no CBD use, and of course unless prescribed by a doctor.

If Pretrial Services thinks that you need to undergo testing to see if you're using a prohibited

substances, I'm going to allow that.

If you're in contact with law enforcement, you need to let Pretrial Services know.  As I like to say, don't let any police officer tell Pretrial Services.  You tell them first, that's how Pretrial Services find out.

I'm going to order that you be -- have an ankle monitor, active GPS positioning, and that you are to be subject to home incarceration, which means you are going to be restricted to your residence at all times, except a medical emergency, court appearances, and to take your kids to daycare and to drop off Ms. Butler at work.  Other than that, yes, sir.

Fair enough, but I want to make -- actually put a little more conditions.  You can leave your house if it's a medical emergency, drop off your kids at daycare and take Ms. Butler to work, okay?  You can do that.

But once you drop Ms. Butler off at work, once you drop your kids off at daycare, you have to go home.  There is no I'm going to go to a restaurant, I'm going to see friends, I'm going to go anywhere else.  You've got to go right back, and the GPS will be very clear on it.

In addition, you can come to court appearances and you can go meet your lawyer, as long as -- and I cannot emphasize this enough -- it has to be preapproved by Pretrial Services.  In other words, your job is to tell

Pretrial Services in advance, couple days in advance, hey, I plan to go see Mr. Kaplan on this day at this time, and get approval from them. Hey, I have a court appearance at this date and time.

Don't just say, oh, I was just -- I want to see Mr. Kaplan on the spur of the moment and I just went down there. You have to get that done with Pretrial Services.

Now, before we go any further, I want to make sure do you fully understand these charges?

THE DEFENDANT: (No audible response.)

THE COURT: Okay. If you have any questions, you go a great lawyer, you got Pretrial Service here. Ask them, okay, understand?

THE DEFENDANT: (No audible response.)

THE COURT: It says -- let me say this. I know we have some family members here and I want to make sure I get your assistance, encouragement, and help to make sure he abides by these conditions because I promise you, Mr. Goffney, I don't want you to be -- let me be clear.

If you violate any of these conditions, no matter how small, I am confident the Government will be back in here and say, he should be held in custody. And you will be held in custody pending the trial if any of these conditions are violated, no matter how small.

So, you know, some people, oh, I got a couple

chances.  This is your chance, okay.  And I promise you I don't want you to be held in custody.  You don't want to be held in custody.  Mr. Kaplan doesn't want you to violate these terms and conditions.  The Government doesn't want to violate.  And I promise your family there doesn't want you to violate these conditions.  Okay.  Make sure you follow these conditions, understood?

THE DEFENDANT:  (No audible response.)

THE COURT:  Okay.  Is there anything that I've forgotten from the Government, from Mr. Kaplan, from Pretrial?

MS. ZENON-MATOS:  Not from the Government, Your Honor.

PRETRIAL OFFICER BARRIENTOS:  (Indiscernible) 24 hours and Defendant can only leave for medical treatment only and court.  Home detention is not 24-hour lockdown and it does have a bigger area of to make -- being able to get out of the home.

Are we going to keep incarceration with those exceptions that you just noted or did you want it noted as home detention?  Home detention will allow him for employment, religion (indiscernible) --

THE COURT:  Home -- I'm with you.  No, I appreciate that.  Home incarceration.

PRETRIAL OFFICER BARRIENTOS:  Okay, home

incarceration.

THE COURT:  There's no -- what I heard today is that Ms. Butler is the one that is working and that he is needed and required to help take the kids and care for the kids at home, so he will be at home.  No work, no educational, no religious.  He is at the house.

PRETRIAL OFFICER BARRIENTOS:  (Indiscernible) exception.

THE COURT:  Correct.

MR. SPEAKER:  (Indiscernible) Butler, be there to pick up and drop off his child, attorneys visits, court appearances, prior preapproval, that's it.  And this pick up and drop off at day care and Ms. Butler doesn't need to be (indiscernible) court appearance prior approval but with those exceptions, just want to make (indiscernible) I will state, Your Honor, for the record, Mr. Goffney doesn't have a passport so we have (indiscernible) so I'm making that representation on the record.

THE COURT:  And let me just make sure we are abundantly clear.  Mr. Goffney, you are restricted to your residence at all time except for medical needs, medical emergencies.  You may take your children to and pick up your children from daycare.  You may drop Ms. Butler off at work and you may pick her up at work.

In addition, you can see and go visit your

attorney and go to court appearances as long as they are preapproved, okay.

I've written all that down.  This is an order that I've filled out that has all these conditions.  Your lawyer will get a copy.  He can give you a copy.

If you have any questions, should I leave the house, do I have permission to, call Pretrial Services, call your lawyer find out first.  Understand, sir.

THE DEFENDANT:  (No audible response.)

THE COURT:  Okay.  Anything else we should address today?

MS. ZENON-MATOS:  Not from the Government, Your Honor.

MR. KAPLAN:  Not from the defense, Your Honor.

THE COURT:  Okay.  Thank you all very much.  And I'm going to give the paperwork to my case manager, Mr. Castro.

Mr. Goffney, if you would have a seat, we'll get that signed, get you to sign it.  And then let me ask, where -- actually where is (indiscernible) held?

MR. SPEAKER:  In Joe Corley, Your Honor.

THE COURT:  Can they get the ankle monitor on today?

(No audible response.)

THE COURT:  Let's do it right now.  We'll get the

ankle monitor on him here.

So what will happen, sir, is you'll be taken to Joe Corley after this and then you'll be released from Joe Corley.  And I'll have to -- yeah, it's up on Conroe.

So, Mr. Kaplan, you'll have to talk to the family. I -- to be honest, I have no idea how long that will take. But at some point later today, tonight you will be released from Joe Corley.

So with that said, thank you all very much.  Have a good day.  And we are off the record.

(Proceedings adjourned at 4:06 p.m.)

*  *  *  *  *

*I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the proceedings in the above-entitled matter.*

*/S/ MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF*

*ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #67677*

*DATE FILED:  OCTOBER 12, 2023*