IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CASE NO. 4:23-CR-00360-4 |
| | § | HOUSTON, TEXAS |
| VERSUS | § | MONDAY, |
| | § | AUGUST 28, 2023 |
| MARTEZ TYREL FOLEY | § | 10:12 A.M. TO 12:52 P.M. |

**ARRAIGNMENT AND DETENTION HEARINGS**

BEFORE THE HONORABLE ANDREW EDISON
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:                    SEE NEXT PAGE
CASE MANAGER:                   RUBEN CASTRO
COURT RECORDER:                 BRANDIS ISON

**THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE UNDER THE CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS AUTHORIZED BY COURT ORDER.   UNAUTHORIZED REPRODUCTION WILL RESULT IN AN ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN ORIGINAL AND ONE COPY AT THE OFFICIAL RATE.   General Order 94-15, United States Court, Southern District of Texas.**

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
mary@judicialtranscribers.com

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**APPEARANCES:**

FOR THE PLAINTIFF:            US ATTORNEY'S OFFICE
                             KELLY ZENON-MATOS
                             1000 Louisiana St., Suite 2300
                             Houston, TX  77002
                             713-567-9000


FOR DEFENDANT FOLEY:         MUSICK LAW OFFICE PLLC
                             JOANNE MARIE MUSICK
                             2219 Sawdust Road, Suite 201
                             Spring, TX  77380
                             832-448-1148


FOR DEFENDANT ROBERTSON:     LAW OFFICE OF CHUKWUDI EGBUONU
                             CHUCK EGBUONU
                             2202 Ruth Street
                             Houston, TX  77004
                             713-635-9488


FOR DEFENDANT JOHNSON:       LAW OFFICE OF GARY TABAKMAN
                             GARY TABAKMAN
                             4801 Woodway, Suite 300W
                             Houston, TX  77056
                             713-429-1624


FOR DEFENDANT STEVENSON:     THE TAUSK LAW FIRM
                             GENE TAUSK
                             733 E. 12th 1/2 Street
                             Houston, TX  77008
                             713-550-4636


FOR DEFENDANT GOFFNEY:       LAW OFFICE OF ROMY B. KAPLAN
                             ROMY KAPLAN
                             5300 Memorial Dr., Suite 750
                             Houston, TX  77007
                             281-969-3725

**INDEX**

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| GOVERNMENT'S: | | | | |
| EVAN BOCK | | | | |
| By Ms. Zenon (Proffer) | 19 | . | 48 | . |
| By Mr. Tabakman | . | 32 | . | 53 |
| By Ms. Musick | . | 37 | . | 57 |
| By Mr. Kaplan | . | 41 | . | . |
| | | | | |
| DEFENDANT JOHNSON'S: | | | | |
| MELISSA MAXIE | | | | |
| By Mr. Tabakman | 59 | . | . | . |
| By Ms. Zenon | . | 64 | . | . |
| KAREN COLE ALFRED | | | | |
| By Mr. Tabakman | 68 | . | . | . |
| By Ms. Zenon | . | 75 | . | . |
| | | | | |
| DEFENDANT FOLEY'S: | | | | |
| DEMETRIUS EWING | | | | |
| By Ms. Musick | 81 | . | 94 | . |
| By Ms. Zenon | . | 90 | . | 95 |

| EXHIBITS: | Marked | Offered | Receive |
|---|---|---|---|
| GOVERNMENT'S: | | | |
| Ex. 1 | | 29 | 30 |
| Ex. 2 | | 29 | 30 |
| Ex. 3 | | 29 | 30 |
| Ex. 4 | | 29 | 30 |
| Ex. 5 | | 29 | 30 |
| Ex. 6 | | 29 | 30 |
| Ex. 7 | | 29 | 30 |
| Ex. 8 | | 29 | 30 |
| Ex. 9 | | | 30 |
| | | | |
| DEFENDANT'S: | | | |
| Ex. 10 | | | 30 |
| Ex. 11 | | | 30 |
| Ex. 12 | | | 30 |

**HOUSTON, TEXAS; MONDAY, AUGUST 28, 2023; 10:12 A.M.**

THE COURT:  I'm Judge Andrew Edison, and we're here on Case 4:23-360.  We have a number of Defendants.  Let me get appearances, first by the Government.

MS. ZENO-MATOS:  Yes, Your Honor.  Good morning. Kelly Zenon on behalf of the Government, ready to proceed.

THE COURT:  Good to see you.

On behalf of the Defendants, let's start with Blake Robertson.

MR. EGBUONU:  Yes, good morning, Your Honor. Chuck Egbuonu on behalf of Blake Robertson.

THE COURT:  Good to see you.

How about for Mr. Kermit Ladell Johnson?

MR. TABAKMAN:  Good morning, Your Honor.  Gary Tabakman on behalf of Mr. Johnson.

THE COURT:  Good to see you, sir.

MR. TABAKMAN:  You as well, Your Honor.

THE COURT:  How about for Tracy Lee Stevenson?

MR. TAUSK:  Good morning, Your Honor.  Gene Tausk for Tracy Lee Stevenson.

THE COURT:  Good to see you.

MR. TAUSK:  Thank you, Your Honor.

THE COURT:  How about for Martez Tyrel Foley?

MS. MUSICK:  That's me, Your Honor, JoAnne Musick.

THE COURT:  Good to see you, Ms. Musick.

And last, but not least, for Harry Keith Dwyan Goffney.

MR. KAPLAN:  Romy Kaplan, Your Honor, good morning.

THE COURT:  Hello, Mr. Kaplan, good to see you all.

MR. KAPLAN:  Good to see you.

THE COURT:  Okay.  We're here obviously today for Arraignments and Detention hearings.  I guess let's see if we can't get the Arraignments out of the way first.

And let me just -- I'll just ask all of you, and see if I can get the lawyers one by one to tell me yes, trying to see if I can get agreement -- well, see if all of you have had the opportunity to review the charges with your clients, whether your clients are ready to plead not guilty to the Indictment, and whether you waive a formal reading of the charges.

On behalf of Mr. Robertson.

MR. EGBUONU:  Yes, we're ready to proceed on the Arraignment, Your Honor, and waive the reading.

THE COURT:  On behalf of Mr. Johnson.

MR. TABAKMAN:  Yes, Your Honor.  We've gone over it and we waive the reading of the Indictment.

THE COURT:  On behalf of Mr. Stevenson.

MR. TAUSK:  Your Honor, I still have not received

the documentation yet from the Government, so I have no position to state one way or another.

THE COURT:  What do you mean you haven't received the -- you haven't had the Indictment?

MR. TAUSK:  I've -- well, I've read the Indictment, Your Honor.  But the other documents I believe their attorneys have.

THE COURT:  Okay.  I'm -- let me step back.  Are we ready to move to an Arraignment?

MR. TAUSK:  Oh, yes, Your Honor.

THE COURT:  I'm -- all I'm talking about right now is Arraignment.

MR. TAUSK:  Okay.  I thought you were talking about the Detention hearing.

THE COURT:  All I'm talking about is Arraignment right now.

MR. TAUSK:  He is ready to move forward, Your Honor.

THE COURT:  Okay.  With respect to Mr. Goffney.

MR. KAPLAN:  We have -- I'm sorry.  We have read it.  He is waiving formal Arraignment and reading, Your Honor.

THE COURT:  And Mr. Foley.

MS. MUSICK:  Thank you, Your Honor.  We are prepared to go forward with Arraignment and waive reading as

well.

THE COURT: Okay. Let me ask each Defendant. I am required to ask you, Mr. Robertson, have you had an opportunity as your attorney indicated to review the charges with you, and do you plead not guilty?

DEFENDANT ROBERTSON: (Indiscernible).

THE COURT: I need you to say it loud. I can't hear you.

DEFENDANT ROBERTSON: Yes, sir.

THE COURT: Okay. Let's -- no, let's walk up to -- make sure you get up to the microphone to be clear.

Let me ask the question again. Mr. Robertson, have you had an opportunity to review the charges set forth in the Indictment with your attorney, and are you ready to enter a formal not guilty plea at this time?

DEFENDANT ROBERTSON: Yes, sir.

THE COURT: Okay. Thank you.

Let me ask. Mr. Johnson, have you had the opportunity to review the charges with your attorney and are you ready to enter a formal not guilty plea at this time? And if you would, just come up to the microphone so it's clear that I can catch your answer.

DEFENDANT JOHNSON: Yes, sir.

THE COURT: Okay. Thank you.

Mr. Stevenson, same question. Have you had an

opportunity to review the charges with your attorney, and are you ready to enter a formal not guilty plea at this time, sir?

DEFENDANT STEVENSON:  Yes, sir.

THE COURT:  Mr. Foley, have you had an opportunity to review the charges with your attorney and are you ready to enter a formal not guilty plea?

DEFENDANT FOLEY:  Yes, sir.

THE COURT:  And, Mr. Goffney, have you had an opportunity to review the charges with your attorney, and are you ready to enter a formal not guilty plea?

DEFENDANT GOFFNEY:  Yes, sir.

THE COURT:  Okay.  Not guilty pleas are entered on behalf of all of you in connection with this case.

This case has been assigned to United States District Judge Al Bennett.  Judge Bennett will hear the future proceedings in this case.

Let me ask the Government, how long do you expect the trial of this case to last?

MS. ZENON:  Your Honor, in this case approximately five days.

THE COURT:  Okay.  I'm going to set -- there'll be a jury trial set for November 6, 2023 at 9:00 a.m.; a pretrial conference November 2nd; proposed jury selection and jury charge to be provided by October 26th; motion

deadlines are September 18 and 26 -- 28, I'm sorry.

I'll enter the formal docket control order today. And obviously if any changes need to be made to that, that will also have to be addressed before Judge Bennett in the future.

Also, because this is the first appearance in this case between defense counsel and Government's counsel, I'm required under Rule 5(f) of the Federal Rules of Criminal Procedure to inform counsel for the Government of your obligation to comply with the disclosure requirements set forth by the United States Supreme Court in the landmark case of *Brady versus Maryland* and its progeny.

Failure to do so may result in sanctions, contempt proceedings, adverse jury instructions, exclusion of evidence, and/or the dismissal of charges.

I'll enter a formal written order to that effect later today because the rules require me to do just that.

Okay.  All that said and done, are we now ready to proceed with the Detention hearing?  And I know we had a question --

MR. TAUSK:  Your Honor, I've not received any documentation other than the Indictment from the Court.

THE COURT:  Do we have -- is this for Mr. Stevenson?

MR. TAUSK:  Yes, Your Honor.

THE COURT:  Do we have it?

MS. DELGADO:  They're working on it, Your Honor.  They're about finalizing it right now.  Somebody will bring it over, hard copies, when it's ready.

THE COURT:  Okay.  What do you want to --

MR. TAUSK:  Your Honor, without reading the documentation, I'm not ready to proceed forward.

THE COURT:  I agree.  Boy, what a waste of time.  Did Mr. Stevenson make himself available for the interview before or when --

MR. TAUSK:  Your Honor, the Indictment --

THE COURT:  No, I mean, when did he meet with Pretrial Services to go over --

MR. TAUSK:  Sir, when did you meet with Pretrial Services?

DEFENDANT STEVENSON:  Today, like --

THE COURT:  Today, okay.

DEFENDANT STEVENSON:  -- 20 minutes ago.

THE COURT:  Okay.  I'm not going to force you to go to a Detention hearing without --

MR. TAUSK:  It's pretty hard, Your Honor.

THE COURT:  -- seeing that.  So what do you --

MR. TAUSK:  I mean, I'm free tomorrow, Your Honor, free on Wednesday, whatever pleasure of the Court, whatever works for the Court.

THE COURT:  Let me -- I assume the proffer's going to be the same for all the folks.

MS. ZENON:  Exactly the same.  We have been providing a copy of the proffers to counsel just to accelerate the process, Your Honor.  And we have the agent here.

MR. TAUSK:  Take a look at it.

THE COURT:  Why don't we do this, if it's okay with you; let's at least hear the proffer.  I'll have that apply, but then I'll continue your hearing to -- before you have to say anything and before you have to cross examine a witness, just actually for timing I think it'd just be easier if we hear the proffer now and --

MR. TAUSK:  Absolutely, Your Honor.

THE COURT:  -- get that out of the way.

MR. TAUSK:  Thank you, Your Honor.

THE COURT:  Okay.  So when do you want to -- let take a look at -- what about tomorrow?

MR. TAUSK:  Tomorrow's fine with me, Your Honor.  Same time, 10:00 a.m.?

THE COURT:  I don't know.  Let me -- oh, boy.

MR. TAUSK:  Two p.m. as well, Your Honor if the Court's -- whatever works for the Court.

(Pause from 10:20 a.m. to 10:21 a.m.)

THE COURT:  Okay.  Let --

(Judge/Clerk confer.)

THE COURT:  Okay.  Mr. Tausk, with respect to Mr. Stevenson, let's do this.  We'll have the proffer today. And then obviously sit and listen to as much or as little as you want.  And then I'm going to bring you back tomorrow at 3:30 p.m.

So I apologize, tomorrow is just crazy.  But basically as soon as the criminal -- I have criminal duty at 2:00.  As soon as we're done with that, --

MR. TAUSK:  That will be great.  Thank you, Your Honor.

THE COURT:  -- we'll do that.  Okay.

MR. TABAKMAN:  Your Honor, --

THE COURT:  Yes.

MR. TABAKMAN:  -- may I please add something to -- since we're discussing potentially continuing, I wanted to address that issue with Mr. Johnson as well.

THE COURT:  I'm not discussing that, but go ahead.

MR. TABAKMAN:  I apologize, but I thought I may as well just in case because I know that some of us have just been recently appointed on Friday.

We hadn't had an opportunity to speak with our respective clients until early this morning.  And then we also have not had an opportunity to speak with family members nor address any issues that may come up during the

course of the Detention hearing.

In speaking with Ms. Musick and Mr. Kaplan, we may need just about 30 minutes to an hour at the very least so that way we can -- I know that my client has some family members here -- so we can communicate with the family and streamline this process so we don't have to move it.

If the Court's amenable to that, I would request that we do that.

THE COURT:  Yes.  I'm amenable.  I want to make sure you have an opportunity to prepare.  So you're saying basically let you all talk to various family members for however long.  And the only -- absolutely, totally will give you that opportunity.

The only thing just FYI, and we'll just have to play with it, I have another Detention hearing starting at noon, which I think's about another five Defendants.

So just -- it is what it is.  If we have to mov and we, you know, if I don't eat lunch, it ain't the end of the world.

(Laughter)

MR. TABAKMAN:  If we can reconvene at 11:00, I think that that will give us enough time.

THE COURT:  Okay.  And if you need more time after that, I'm going to give you more time.  So let's do this. Just so we're clear, when we get -- when we start the

14

hearing, I think everyone's on board on this, but the way I like to do it is that the Government will have a proffer -- and who is the witness going to be?

MS. ZENON:  Your Honor, Agent Bock is here.  And I provided a copy of the proffer to all counsels --

THE COURT:  Okay.

MS. ZENON:  -- that I'm going to read.  So --

THE COURT:  Okay.

MS. ZENON:  And I provided also a copy to the court manager, Your Honor.

THE COURT:  Okay.  It's Agent --

MR. BOCK:  Bock, sir.

THE COURT:  How do you spell that?

MR. BOCK:  B-O-C-K.

THE COURT:  Okay.  And so what will happen is I'll have you give the proffer.  After the proffer's made, Agent Bock, I'll then swear you in, ask if you're willing to accept the proffer as your testimony here today under the penalty of perjury or if there are any changes, additions, or subtractions.

And then as soon as you say yes or make whatever additions, subtractions, I'll turn it over for full and complete cross examination to the defense.

MR. BOCK:  Sure.

THE COURT:  So, okay, let's take a break until

11:00 a.m.  and if we need more time, that's fine.  Let's just at least reconvene at 11:00 a.m. and go from there. We're off the record.

MR. TABAKMAN:  Thank you, Your Honor.

MS. MUSICK:  Thank you, Your Honor.

(Recess taken from 10:25 a.m. to 11:05 a.m.)

THE COURT:  Let's go back on the record.

Let's start with the defense.  Have you all had an opportunity to talk to your client, confirm with your clients?

MR. EGBUONU:  Chuck Egbuonu on behalf of Mr. Robertson.

We have, and Mr. Robertson's going to waive his Detention hearing this morning.

THE COURT:  Okay.  Mr. Robertson -- and you've had an opportunity to discuss with your client what that means, you've explained that to him, and after that he to the best of your knowledge is willfully, freely, voluntarily, knowingly giving up the right to have a Detention hearing.

MR. EGBUONU:  That is correct, Your Honor.

THE COURT:  Okay.  Mr. Robertson, let me ask you directly, as I'm required to do.  You understand that the Government has requested that you be held in Detention pending the trial of this case.

My understanding from your lawyer is that you're

willing to give up or waive the right to have a hearing on that.

What that means is, in effect, that you will be held in custody pending the trial of this case, whenever that trial is.

Have you had an opportunity to review that issue with your attorney, and are you indeed giving up the right to have a Detention hearing freely, voluntarily, willingly, and knowingly?

DEFENDANT ROBERTSON:  Yes, sir.

THE COURT:  I'm sorry?

DEFENDANT ROBERTSON:  Yes, Your Honor.

THE COURT:  Okay.  Based on the representation of yourself and your attorney, I'm going to accept the waiver of the Detention hearing.

There'll no be -- no need to have a Detention hearing with respect to you, and that you'll be remanded to the custody of the United States Marshals pending the trial of this case.

At least with this Defendant anything else from the Government today?

MS. ZENON:  No, Your Honor.

MR. EGBUONU:  Nothing else from the defense, Your Honor.

THE COURT:  Okay.  Thank you very much.  You --

MR. EGBUONU:  Thank you.

THE COURT:  -- may have a seat.

With respect to the other -- yes.

MR. TABAKMAN:  Oh, I was going to speak.  Once you had asked, Your Honor, I was ready to speak, Your Honor.

THE COURT:  Go ahead.

MR. TABAKMAN:  Thank you, Your Honor.  We're ready to proceed on Mr. Johnson, Your Honor.

THE COURT:  Okay.  Is everyone else ready to proceed?

MS. MUSICK:  Yes, Your Honor.

THE COURT:  With respect to Mr. Stevenson, what do we want to do?

MR. TAUSK:  I just received the Pretrial Report, Your Honor.  If it please the Court, I'd still like to go ahead tomorrow at 3:30 p.m.

THE COURT:  Absolutely.

MR. TAUSK:  Thank you, Your Honor.

THE COURT:  Sounds good.

MR. KAPLAN:  On behalf of Mr. Goffney, we'll proceed today, Your Honor.

THE COURT:  Okay.

MS. MUSICK:  And Mr. Foley will be proceeding as well.

THE COURT:  Okay.  Let me have the Government

provide the proffer, if you would.

MS. ZENON:  Yes, Your Honor.  We'll be providing the proffer.  For the Record, we have provided a written version of the proffer to all counsels.

And we have also the intention of marking some exhibits with the agent, and we are going to be providing them and circulating them through counsels while I read the proffer.  We'll be presenting eight exhibits, which are pictures.

THE COURT:  Have you given the eight exhibits to the --

MS. ZENON:  We are going to be passing them to counsel.

THE COURT:  Well let's give them to them now, let's not --

MS. ZENON:  Right, sure.

THE COURT:  This all should be done ahead of time. There's no reason to try to spring anything on anybody and be a surprise to anyone.

MS. ZENON:  Apologize, Your Honor.  Should we start --

THE COURT:  And please provide a copy if you have to the Court as well.

MS. ZENON:  Your Honor, that was going to be the copy of the Court.  We didn't bring additional copies.

THE COURT:  Okay.

MS. ZENON:  So --

THE COURT:  The floor is yours, make the proffer.

MS. ZENON:  Yes, Your Honor.  In this case, Your Honor, the Government --

THE COURT:  Wait, I want to make sure, there's no copies for the witnesses of the exhibits, for the Defendants of the exhibits?

MS. ZENON:  Your Honor, we just printed those copies.  We apologize.  We can, you know, we can email some copies.  Your Honor, we can get some copies for them.

THE COURT:  Okay.  Let's go ahead with the proffer.  I don't want to take any more time up.

MS. ZENON:  Yes, Your Honor.

DIRECT EXAMINATION BY PROFFER

MS. ZENON:  Your Honor, in this case the Government is going to make available Officer Evan Bock for cross examination.

And in this particular case, if the federal bureau of -- if Federal Bureau of Investigation, FBI Task Force Agent Evan Bock were called to testify, he would testify as to the following.

That I am a task force officer with the Federal Bureau of Investigation currently assigned to the FBI Houston field office, Violent Crimes Task Force.

I was part of the FBI team that coordinated a control robbery sting operation in the Houston area on August the 7th, 2023.

The operation resulted in a crew of five individuals:  Defendant one, Blake Robertson; Defendant two, Kermit Ladell Johnson --

MR. KAPLAN:  I'm sorry to interrupt, Your Honor.

MS. ZENON:  Yes.

MR. KAPLAN:  Can -- rather than having the Government read the whole proffer, just have the witness testify.  We can all read, ask questions, and it might save all of us some time and admit the proffer into evidence. And then we can ask direct questions that way save the Court time and --

THE COURT:  Well, let me say this.  I think it's important for all the Defendants to hear the proffer so --

MR. KAPLAN:  We don't -- I don't disagree with that, Your Honor.  I just --

THE COURT:  Right.  So that -- I don't think -- and I totally respect your view on this.  My view is instead of putting up the witness and having the witness, you know, tell me about your background, the question, answer, I think it'd go on a lot longer than the proffer.

So my thought is -- and although everyone has the written proffer, I hear you, I just think it's important to

have it read into the record and let every party in the case hear what the proffer is.  So --

MR. KAPLAN:  I appreciate it.  Sorry about that.

THE COURT:  -- understood.

MS. ZENON:  Okay.

THE COURT:  Please proceed.

MS. ZENON:  Thank you, Your Honor.  We're going to continue with paragraph number three.

The operation resulted in a crew of five individuals:  Defendant Blake Robertson; Defendant two, Kermit Ladell Johnson; Defendant three, Tracy Lee Stevenson; Defendant four, Martez Tyrel Foley; and Defendant number five, Harry Keith Dwyan Goffney, members of the Early Boys Scootup Gang, who agreed with each other and later attempted to rob what they believe to be individuals who had stored 30 kilograms of cocaine and 400 firearms in a trailer located in an isolated location at 4200 N. Eldrige Parkway in Houston.

During the month of July of 2023, an FBI cooperating source, CS-1, who was introduced to various members of the gang earlier in the year as an individual allegedly involved in illegal activities, had multiple conversations with Defendant number one, Blake Robertson, regarding the sale of drugs and firearms, as well as the possibility of coordinating plays together.

The word "play" was commonly used in the Early Boys Scootup Gang members to mean armed robberies.

In late July of 2023, FBI CS-1 introduce an additional FBI CS-2 as a middleman of a firearms dealer.

During a subsequent recorded three-way telephone conversations between Defendant number one, Blake Robertson, FBI CS-1 and FBI CS-2, a play, or robbery, offer by FBI CS-2 was discussed, which was the robbery of kilograms of cocaine and firearms stored in a trailer.

On July 26, 2023 FBI CS-1 introduce the firearms dealer, FBI CS-3, to Defendant number one, Blake Robertson, during a conversation in which the sale of firearms by Blake Robertson to the FBI CS-3 was discussed.

On August the 3rd, 2023, CS-1 and Defendant number one, Blake Robertson, discuss in a recorded conversation the play or robbery offer by CS-2.

During the conversation Robertson stated that he had recruited ten individuals to participate in the play or robbery.  Specifically Defendant number one, Blake Robertson, stated there are about ten -- and he uses the "N" word -- on the spot.

In addition, Defendant number one, Blake Robertson, also stated in the same conversations -- conversation that this individuals did not have any family and were ready to take down law enforcement officers if

necessary.

Specifically Defendant number one, Blake Robertson, stated them -- and he uses the "N" word -- ain't have any families, them, the "N" word, taking down laws if they have to.

On August 1st and 4th of 2023, Defendant number one, Blake Robertson, sold firearms to FBI CS-3, the alleged firearms dealer, specifically three Glock pistols and one Taurus pistol, for $2800 in U.S. currency, and one Glock pistol, one Ruger LCP pistol, one AR-15-type pistol, and one AR-15-type rifle for $2500 in U.S. currency.

The transactions were audio recorded, and the firearms are currently in the custody of the federal authorities.

On August 6, 2023, during a three-way telephone conversation between Defendant number one, Blake Robertson, CS-1, and CS-2, they discussed once again the play or robbery of the kilograms and firearms stored in the trailer.

In said conversation, Defendant number one, Blake Robertson, assure CS-2 that he had his people ready to meet and continue the plan.  They also discuss paying Robertson's people in gang slang to break bread.

On the same day, August 6, 2023, CS-3, the alleged firearms dealer who had purchased firearms from Defendant number one, Blake Robertson, met in person with Robertson.

During the meeting CS-3 told Defendant number one, Blake Robertson, that the play or robbery being offer by CS-2 was his play and that he was the one planning it.

Defendant number one, Blake Robertson, and CS-3 then discuss the play or robbery to take place on August the 7, 2023 in detail, to include the fact that the owners of the materials were Arabs.

During same conversation Defendant number one, Blake Robertson, asked about the number of kilos, and CS-3 clarified that he expected a lot of kilograms to be in the trailer.

Defendant number one, Blake Robertson, then requested $500 in used currency for each member of his crew, to which CS-3 agreed.

On the day of the robbery, August 7th, 2023, Defendant number one, Blake Robertson, met with CS-3 at the Homewood Suites by Hilton Houston at 8950 Fallbrook Drive at around 11:15 a.m. and went over the robbery plan once again with CS-3.

This time CS-3 revealed that he expected the trailer to contain approximately 30 kilograms of cocaine and 400 firearms.

CS-3 also revealed to Defendant number one, Blake Robertson, that he expected two individuals were probably going to be in the area protecting the trailer, but one of

them was probably going to be drunk.

CS-3 agreed to take Robertson's crew to the location, depart, and wait for them in a separate location.

During the meeting, Defendant number one, Blake Robertson, requested the payment for his crew members. But CS-3 only agreed to provide half of the payment first, and then the rest upon the conclusion of the operation.

The conversation between Defendant number one, Blake Robertson, was video and audio recorded by members of the FBI who were at the hotel surveilling the operation.

After departing the hotel, Defendant number one, Blake Robertson, sent a text message to CS-3 to show that he was putting his crew together. The message was a screenshot of messages between Defendant number one, Blake Robertson, and four other individuals.

Later that day four individuals arrive at the hotel to meet CS-3 to discuss the operation. This individuals were Defendant number two, Kermit Ladell Johnson; Defendant number three, Tracy Lee Stevenson; Defendant number four, Martez Tyrel Foley; and Defendant number five, Harry Keith Dwyan Goffney.

During the meeting, CS-3 discuss with the four Defendants all the details of the operation, once again to include the number of kilos and firearms suspected to be at the trailer.

The four Defendants were advised to expect resistance at the location.  The conversation between CS-3 and Defendant number two, Kermit Ladell Johnson, Defendant number three, Tracy Lee Stevensons, Defendant number four, Martez Tyrel Foley, and Defendant number five, Harry Dwyan Goffney, was video and audio recorded by members of the FBI who were at the hotel surveilling the operation.

After the conversation, CS-3 and the four Defendants departed the location of the robbery, which was an abandoned lot at 4200 N. Eldridge Parkway in Houston.

After arriving to the location, Defendant number two, Kermit Ladell Johnson, Defendant number four, Martez Tyrel Foley, and Defendant number five, Harry Keith Dwyan Goffney, entered the property by jumping the main gate after a fail attempt at breaking the lock.

All three Defendants wore hoodies pulled over their heads, masks, and gloves.  Defendant number three, Tracy Lee Stevenson, stayed outside as a lookout.

The operation was video recorded by surveillance cameras installed by the FBI.

Defendant number two, Kermit Ladell Johnson, and Defendant numbers four, Martez Tyrel Foley, and Defendant number five, Harry Keith Dwyan Goffney, spotted the trailer and made several attempts to break the lock using various pieces of debris from the area.

Sometime later Defendant number two, Kermit Ladell Johnson, Defendant number four, Martez Tyrel Foley, and Defendant number five, Harry Keith Dwyan Goffney, made entry into the trailer and remove all the contents.

Defendant number five, Harry Keith Dwyan Goffney, was observed carrying a rifle, while Defendant number two, Kermit Ladell Johnson, and Defendant number four, Martez Tyrel Foley, were observed carrying handguns.

After being unable to locate any narcotics, the three Defendants exited the property and return to their vehicles.

Shortly after, Defendant number two, Kermit Ladell Johnson, and Defendant number three, Tracy Lee Stevenson, who had stayed originally outside, returned to the trailer and this time were not wearing any face coverings or gloves.

Defendant number two, Kermit Ladell Johnson, and Defendant number three, Tracy Lee Stevensons, made a video phone call via FaceTime application to the CS and Robertson to show them that the drugs were nowhere to be found.

Defendant number three, Tracy Lee Stevenson, was observed carrying an AR pistol in the video recording.

A few minutes later, Defendant number two, Kermit Ladell Johnson, and Defendant number four, Martez Tyrel Foley, and Defendant number five, Harry Keith Dwyan Goffney, departed the trailer area.

Shortly after, all four Defendants entered their vehicles and departed their location.

At around 4:40 p.m., Houston Police Department officers conducted a traffic stop of a Nissan Altima for failure to signal lane change.

And Defendant number three, Tracy Lee Stevenson, was identified as the driver, while Defendant number four, Martez Tyrel Foley, was identified as the passenger.

Defendant number three, Tracy Lee Stevenson, was found to have 14 open pending wants and was arrested.

HPD officers recover a black Stoeger STR-9Z nine millimeter pistol loaded with one round in the chamber from the vehicle. Further investigation revealed that the pistol had been reported stolen.

Inventory search of the vehicle revealed a bag containing a liquid similar to urine in front of the passenger side.

Defendant number four, Martez Tyrel Foley, was questioned as to the nature of the container, and admitted that he was going to use the liquid during an upcoming drug test in order to avoid problems with his parole.

Defendant number four, Martez Tyrez [sic] Foley, was arrested upon said admissions and falsifying a drug test as a misdemeanor in the State of Texas.

On August 24, 2023, Defendant number one, Blake

Robertson, Defendant number two, Kermit Ladell Johnson, Defendant number three, Tracy Lee Stevensons, and Defendant number four, Martez Tyrez [sic] Foley, and Defendant number five, Harry Keith Dwyan Goffney, were arrested as a result of the federal indictment.

On the same day, Defendant number one, Blake Robertson, waived his constitutional rights and agreed to provide statements to the FBI.

During the interview, Robertson admitted to the officers that he had recruited the crew to participate in the robbery.

That's the proffer, Your Honor.  The agent is available to be cross examined.

THE COURT:  Okay.  Agent Bock, would you do me a favor, please?

EVAN BOCK, GOVERNMENT'S WITNESS, SWORN

THE COURT:  Okay.  Why don't you take the witness stand.

THE WITNESS:  Yes, sir.

THE COURT:  And I understand that I've been handed what I understand is Exhibits 1 through 8 that the Government would like to be introduced into evidence.

MS. ZENON:  Yes, Your Honor.

THE COURT:  Is there any objections from the Defendants for having those exhibits entered for the purpose

of this hearing and this hearing only?

MR. KAPLAN:  None from Mr. Goffney.  But can we also have -- can the Government also admit the proffer into the record as well?  I know it was read but also as Exhibit 9?

THE COURT:  Sure.

MR. KAPLAN:  I'm not offering it.  I'm just asking.

THE COURT:  Yeah, we'll do that.  Sua sponte I'll do that.  Okay.  So Exhibit 1 through 8 are the photographs that the Government's provided.  Exhibit 9 is the proffer for the Detention hearing.

I'm going to enter into evidence as Exhibit 10 the pretrial report for Mr. Johnson.  Eleven is going to be the pretrial report for Mr. Foley.  And 12 is going to be the pretrial report for Mr. Goffney.

(Government's Exhibits Numbers 1, 2, 3, 4, 5, 6, 7, 8, and 9 were received in evidence.)

(Defendants' Exhibits Numbers 10, 11, and 12 were received in evidence.)

Okay.  I think I swore you in.

THE WITNESS:  Yes, Judge.

THE COURT:  I forgot to ask the question.  You heard the proffer that was given.  Do you accept that as your testimony here today, sir, under oath, under the

penalty of perjury?

THE WITNESS:  I do, Judge.

THE COURT:  Okay.  I'll turn it over to the Defendants for cross examination.  And I'll defer to you all as to what order you want to go on.

MR. TABAKMAN:  I don't mind proceeding first, Your Honor.

THE COURT:  But what -- wait a second, hold on. Where did Mr. Tausk go?

MR. TABAKMAN:  I believe he's reset for tomorrow, Your Honor.

MR. SPEAKER:  He stepped outside with --

THE COURT:  Did his client -- did I miss something?  I thought they were going to sit here for the purpose of this hearing.

MR. TAUSK:  I'm sorry, Your Honor.  I was just talking to my client's family.

THE COURT:  Okay.  I just want to make sure we -- is there another -- I just want to make sure.  You were here for the proffer, right?

MR. TAUSK:  Yes, Your Honor.

THE COURT:  Okay.  So just so we're clear, I'm now going to turn it over for cross examination to the other Defendants.

MR. TAUSK:  Okay.

THE COURT:  And with respect to Mr. Stevenson, anything from now on that goes on in this hearing will not impact your hearing at all.  You'll be entitled to full cross examination and anything else.

And I'll enter into evidence the same exhibits tomorrow for that hearing, as well as the pretrial report --

MR. TAUSK:  That's fine, Your Honor.

THE COURT:  -- that we just received.  Okay. Thank you.

MR. TAUSK:  Permission to be excused, Your Honor.

THE COURT:  You're excused now if you want.

MR. TAUSK:  Thank you so much

THE COURT:  Thanks.

Okay.  Cross examination, please proceed.

MR. TABAKMAN:  Thank you, Your Honor.

Good morning, Agent.

THE WITNESS:  Good morning.

MR. TABAKMAN:  And I'm sorry, I know you're sitting far away, but I hope you can see me and hear me. Agent, I represent Mr. Kermit Ladell Johnson, who's sitting right here next to me.

CROSS-EXAMINATION

BY MR. TABAKMAN:

Q    My understanding based on the proffer is that Mr. Blake Robertson was the focal point of your investigation from the

get-go; is that not correct?

A    I would not describe that way.

Q    Well, he's the individual, though, that's primarily listed on the proffer as the one that is putting together the entirety of this operation; isn't that right?

A    Yes.

Q    Okay.  And so at some point in time Mr. Robertson is made to be the person that you are ultimately seeking out in order to put this crew together, right?

A    The opportunity presented itself through Mr. Robertson.

Q    Understood.  Now, at what point in time did Mr. Kermit Ladell Johnson become part of this investigation?

A    I don't have a specific timeframe for when he came on our radio.  It's sometime July.

Q    Okay.  July, closer to the time of the events or sometime early July; when was it?

A    People were identified throughout the course of this, prior to this -- these events occurring.  I cannot state with certainty what time he became identified.

Q    Okay.  And can you state with certainty at what point in time you found out that Mr. Johnson and Mr. Robertson had some type of relationship?

A    Again, before, but I can't state with certainty on what date.

Q    Okay.  Well what was the extent of that relationship?

A    Well, they're members of the same criminal organization.

Q    And how did you come to find that out?  What led you to believe that they're a part of this organization, or specifically that Mr. Johnson is part of that organization?

A    Well, I could state that he's part of the organization based on criteria set forth in Texas statute.

Q    But that's not what I'm asking you.  What led you to believe outside of the statute that he's part of some type of organization that Mr. Robertson is also part of?

A    Sure.  So, again, that would be based on what I know about your client.  And so my belief that he's part of that organization is I refer to the Texas statute as to whether we classify him as a member of the organization or not.

Q    I'd like to know the specifics, though, in the connection between him and Mr. Robertson that would also classify him as part of that organization.  That is what I'm asking you.

A    Sure.  So there's eight criteria.  There's two that were -- are required, the two that I would just off the top of my head reference are he associates with known gang members, and he participates in criminal activity with them.

Q    Okay.  And so to your knowledge, based on up until that point in time, did Mr. Robertson have any contact or communication prior to the events of him putting this crew

together that they both communicated and participated in crimes together?  Do you have any sort of information that has led you to believe that?

A    I don't know what the numbers on their communications are at this time.

Q    Okay.  Well, I'm asking are there any communications prior to this crew being put together between Mr. Johnson and Mr. Robertson?

A    I don't know right now.

Q    Okay.  So the answer's no.

A    No.  The answer is not no.  The answer is I don't have those numbers available to me.

Q    Okay.  So you think that there are communications but you don't know what those numbers are.

A    I would think so.

        MR. TABAKMAN:  One moment.

Q    Now, Agent, will you please tell me the Early Boys Scootup Gang, are they identified and located in a particular geographical location within the Houston area?

A    They typically operate in southeast Houston.

Q    Okay.  And specifically these gangs are typically in organized locations based on area, right; would that be correct?

A    They congregate in certain locations.  They don't all live there.

Q     Okay.  Now, are you aware of the location of where Mr. Johnson lives; does he live in that particular area?

A     I don't know specifically.

Q     Okay.  So if I were to tell you that Mr. Johnson doesn't live in that location nor does he affiliate himself with the Early Boys Scootup Gang, would you agree with me or you disagree with me?

A     I would not agree with you.

Q     Okay.  Now, at some point in time Mr. Robertson asks concealed source number three that $500 be provided for each member of the crew; isn't that correct?

A     Yes.

Q     Okay.  And so is it your impression and understanding that Mr. Robertson is sort of -- takes the lead on this in recruiting different individuals and just in random order in order to facilitate this crime to happen; is that sort of what occurs here?

A     I don't know about in random order, but everything else, yes, I would agree with.

          MR. TABAKMAN:  At this time I'll pass the witness, Your Honor.

          THE COURT:  Okay.  Thank you.  Who's next?

          MS. MUSICK:  Your Honor, on behalf of Mr. Foley, I'll proceed.

          Agent, hi.

THE WITNESS:  Good morning.

MS. MUSICK:  Good morning.  You -- I don't want this to be too repetitive but I know that a lot of the questions that you just heard were related specifically to Mr. Johnson.  And I'd like to focus on Mr. Foley at this time.

CROSS-EXAMINATION

BY MS. MUSICK:

Q    When did you first become aware of Mr. Foley as being an individual that was participating in this -- or that was involved in this investigation?

A    In this specific incident?

Q    Yes.

A    We knew that he was involved in it for sure when he arrived at the hotel room.

Q    Okay.  And when was that?

A    On the -- April 7th.

Q    April 7th?

A    I'm sorry, August 7th.

Q    Okay.

A    Oh, geez.

Q    And prior to August 7th were you aware of Mr. Foley or his identity of any -- for any reason?

A    I believe so.

Q    You were or you were not?

A    I believe so.

Q    You were?

A    Was I -- are you asking me personally or whether our

Q    Yes.  I'm asking --

A    -- investigating team was?

Q    -- if you were.

A    I -- me, no.

Q    And were you present on August 7th?

A    I was not.

Q    So it would be safe to say as of August 7th, you knew nothing about Mr. Foley or his participation.

A    Again, me or my team?

Q    You.

A    Me, no.

Q    But you're here to testify for your team and what they may or may not have known.

A    Correct.

Q    Okay.  When did you become a member of this team?

A    This case specifically, at the inception of when this case started, which was around maybe January.

Q    So from January through August 7th, you didn't -- you had no indication of who Mr. Foley was, despite being a member of this team.

A    That's correct.

Q    And based on your proffer, do I understand that your

testimony would be that Mr. Foley is a member of Early Boys Scootup Gang?

A    Correct.

Q    And on what do you base that knowledge?

A    The same as the other.  There's criteria listed that we used for documentation purposes.

Q    I understand there's criteria.  But that criteria has to have a basis or underlying facts.  Are you aware of the underlying facts that led you to that opinion?

A    Yes.

Q    And what type of facts are those?

A    He associates with known gang members, participates in criminal activities with them,  including being arrested, --

Q    And --

A    -- and he frequents locations.

Q    And when did you see Mr. Foley associate with known gang members?

A    Through communication records.

        THE COURT:  Through what?  I didn't hear.

        THE WITNESS:  Communication records, phone conversations, records of phone conversations, texts.

BY MS. MUSICK:

Q    And when was that?

A    I don't know specifically.

Q    And when did you learn that Mr. Foley participated in

criminal activities with known gang members?

A    Well, for these purposes on this date.

Q    So you learned all of this on August the 7th.

A    Not all of it.

Q    Well, what -- which parts did you know before August 7th?

A    The communication.

Q    And when you say the communication, can you just give me an overview of what that communication is?

A    Sure.  We have records of communication between your client and other known gang members  of the Earl Boys Scootup enterprise.

Q    And when you say communication, you mean?  What type is what I'm getting at.

A    Oh, toll records.

Q    Did you say --

A    Toll records.

Q    Toll records, thank you.  So telephone records.

A    Correct.

        MS. MUSICK:  Okay.  Thank you.  I wasn't sure what kind of communication you were referring to.

Q    But you were not present on August the 7th.

A    I was not.

Q    So you can't say with certainty what occurred on August the 7th.

A    I have been debriefed, I reviewed the evidence so everything offered here I could say with certainty.

MS. MUSICK:  I pass the witness.

MR. KAPLAN:  Thank you.  May I proceed?

THE COURT:  Absolutely.

MR. KAPLAN:  My name is Romy Kaplan, and I represent Mr. Goffney.

CROSS-EXAMINATION

BY MR. KAPLAN:

Q    You talk a lot about some various things, but what -- you are employed with the FBI, you're a task force officer. Who was the head of this operation?

A    Case agents were Special Agent Holder and Special Agent McCook.

Q    Excuse me?

A    McCook.

Q    Spell that for me, please.

A    M-C-C-O-O-K.

Q    Thank you.  And you took your orders from them; is that correct?

A    It's more of a collaboration and less giving orders to each other.

Q    Fair enough.  And you were aware of the criminal -- of this alleged criminal organization through a database of some kind otherwise known as a gang tracker; is that fair to

say?

A    No.  I've been aware of this criminal organization since around 2017.

Q    And what brought your attention to this organization?

A    At the time over 53 homicides that had occurred in the southeast area as part of a gang war that they're a part of.

Q    And so you're awareness of them in 2007 --

A    Seventeen, sorry.

Q    Seventeen, excuse me.  Did you have their communications and phone records back in 2017 or were those recently obtained?

A    These -- not all of these individuals.  I did have a vast amount but I do -- I cannot say with certainty whether I have any of these Defendants.

Q    Okay.  And so going back to this criteria that you mentioned about, what is the level of association that you have for Mr. Goffney with others members of this organization?

A    It would be the same as the other two at this point.

Q    And that what -- that would be what?

A    So association and --

Q    And I'm asking you what type of associations, communications, or how is it that they have been associated together in the opinion of law enforcement?

A    At this point I'd offer communications.

Q    And at a later point?

A    As we learn more and dig in more, that may change.

Q    So you haven't dug in yet is what you're saying.

A    I think that's fair to say.

Q    Okay.  So there's a lot left to be learned about these men that have been charged here today.

A    Sure.

Q    But specifically since you are unaware of it at this time but will learn it in the future, do you mind discussing what other associations between each other that they have that you are aware of?

A    I'm not aware of any.

Q    Okay.  And are you aware -- what criminal activity are you aware of for Mr. Goffney?

A    The incident described in the proffer letter.

Q    So nothing outside of the proffer letter from August 7th.

A    Me, personally, no.

Q    Right.  And so you're unaware of the frequency of the locations that Mr. Goffney visits.

A    Correct.

Q    And you're unaware of his criminal activity, of his alleged criminal activity; is that right?

A    Other than this, yes.

Q    And you are unaware of his associations with other

alleged members of this organization.

A    Other than I know that he has telephonic contact with other members, yes.

Q    Okay.  And describe for us and the record the telephonic records that you are aware of.

A    In detail?

Q    Sure.

A    I haven't prepared it and I don't have it memorized.

Q    And so what was your role in this investigation?

A    Due to my experience with the organization in the past, I offered guidance, counsel.  I did participate in other things other than just on this date.

I will likely be the person that does forensic examinations of their cellular devices.  I offered the search warrants -- or authored the search warrants that we used on the date of their arrest for some of these individuals.

Q    So you were the affiant of the search warrant; is that what you're saying?

A    Yes.

Q    And how is it that you learned the facts and evidence and information for that search warrant if you weren't present on August the 7th?

A    I was thoroughly debriefed and I was afforded the opportunity to ask questions to all the individuals that

were present.

Q   So you learned from other agents firsthand who were there but you weren't.

A    Correct.

Q    That's hearsay, right?

A    It's acceptable in this -- in a search warrant affidavit and it's acceptable in this location.

Q    I'm aware of that.  But it was hearsay.

A    Yeah, well, --

Q    Okay.

THE COURT:  Yes or no.

THE WITNESS:  Yes.

MR. KAPLAN:  Great.

BY MR. KAPLAN:

Q    And so you weren't present August 7th.  You weren't present for the arrest.  And yet you were still asked to draft the search warrant to search for the arrest.  When you executed -- you said an arrest warrant or a search warrant?

A    Well, we had some for some -- and everyone had an arrest warrant, some locations had search warrants as well.

Q    And what locations were searched?

MS. ZENON:  Your Honor, I mean, our objection goes that this is just outside of the purview of the Detention hearing.  Now we're going into search warrants --

THE COURT:  Hold on.  What does this have --

obviously I'm willing to give you a lot of leeway, but I'm not sure what this has to do with whether or not the Defendants are a risk of flight or danger to the community, and whether there are any conditions that I can impose to alleviate that.

MR. KAPLAN:  I'm looking for any other association that the Government is alleging for my client so as who I can attack associations in further --

THE COURT:  Just ask that --

MR. KAPLAN:  -- future date --

THE COURT:  Just ask that question.

MR. KAPLAN:  All right.

THE COURT:  Are there any further -- I mean, I think he's -- well, instead of going into where we searched and what search warrants, just ask that question.

BY MR. KAPLAN:

Q    Well I'm trying to find out what is it, what was searched that would give you evidence about these gentlemen.

A    There were multiple locations.  I don't have their addresses memorized.

Q    Is it because you weren't involved with that and you learned about it secondhand?

A    I was not on scene when the searches occurred.

Q    But yet you're here to testify today to keep these gentlemen in custody as a result of the charges that have

been brought.

A    That's correct.

Q    Okay.  And do you have any information as to Mr. Goffney's ties to the Houston area?

A    I don't.

Q    Do you have any idea of he has a passport?

A    I don't.

Q    Do you have any idea of the level of family or friends or ties to the community in the Houston area?

A    I don't.

Q    Are you aware of any examples of time if Mr. Goffney was a -- are you aware of the location where Mr. Goffney resides or where he grew up?

A    I'm not.

Q    And if he grew up say on east side, southeast side, anywhere outside of southwest Houston, would that surprise you?

A    No.

Q    So explain to us -- explain for the record how it is that somebody who is on -- lives in the southeast or the northwest side of town would be associated with the southwest Houston local regional neighborhood gang.

          MS. ZENON:  Your Honor, we again --

          THE COURT:  Let's make an objection.

          MS. ZENON:  Relevance.

THE COURT:  Okay.

MS. ZENON:  Completely --

THE COURT:  Overruled.

BY MR. KAPLAN:

A    So I previously stated the southeast, not southwest, just to make sure the question is --

Q    I have my notes --

A    -- what you mean.

Q    -- that you had said southwest Houston.

A    I said southeast, sir.

Q    Okay.  So southeast Houston, okay.

A    Yes.

MR. KAPLAN:  I'll pass the witness, Your Honor.

THE COURT:  Okay.  Thank you.  Any questions from the Government?

MS. ZENON:  Yes, Your Honor, briefly.

THE COURT:  Please proceed.

REDIRECT EXAMINATION

BY MS. ZENON:

Q    Agent Bock, you stated that you specifically did not participate in this particular operation on August the 7th, 2023.

A    That's correct.

Q    However, let me clarify since some exhibits have been marked.  Was this operation recorded in video and audio?

A    It was.

Q    Have you been able to review either pictures or video or audio of this particular operation?

A    I have.

Q    And that's how you learned of everything that happened on that date with the video and audio.

A    That's one of the ways, yes.

MS. ZENON:  Okay.  No additional questions, Your Honor.

THE COURT:  Okay.  Thank you.  Anything else from the defense?

MS. MUSICK:  No, Your Honor.

THE COURT:  Agent Bock, you may step down from the witness stand.  Thank you very much.

Anything further from the Government?

(Witness steps down.)

MS. ZENON:  Yes, Your Honor.  We just want to -- and I apologize, before the agent steps down, Your Honor, we want to specifically have the agent explain what the exhibits particularly mean just to have those clear for the record, Your Honor.

THE COURT:  Okay.  There are further questions. Have a seat, sir.

MS. ZENON:  Yeah.  I apologize, Your Honor.

(Witness retakes the stand.)

THE COURT:  Go ahead.

MS. ZENON:  Your Honor, permission to approach the witness and --

THE COURT:  You may.

MS. ZENON:  -- show him the exhibits.  And I'm showing the exhibits marked as Government's Exhibit 1 through 8.

Agent Bock, for purpose of the record, please examine the exhibits.  And I want to make sure that you recognize as exhibits that contain evidence related to the events of August the 7th, 2023, or earlier events.

(Pause)

THE COURT:  Okay.  Let's go.

MS. ZENON:  Yes, Your Honor.

REDIRECT EXAMINATION (CONT'D)

BY MS. ZENON:

Q    Can you please state or describe what are we seeing in Exhibit 1?

A    Yes.  This is a photograph taking of the firearms that were sold to CH-3 (phonetic) by Defendant Robertson.

Q    Defendant Robertson.  And what are we seeing in Exhibit 2?

A    This is the pre-meeting location prior to the actual sting operation of Mr. Robertson meeting with CHS-3.

MS. ZENON:  Your Honor, I may have by a typo

jumped a number.  So the next one is Exhibit 4.

A    Exhibit 4 is immediately prior to the sting operation the Defendants' meeting with the CHS in the hotel room.

Q    Okay.  Let me go back because I don't have -- I've got a copy.  But do you have Exhibit 3 before you?

A    I do.

Q    Okay.  Please continue, explain what are we seeing in Exhibit 3?

A    Yes.  Exhibit 3 is a screenshot that was sent to CHS.

Q    By whom?

A    By Defendant Robertson.

Q    And what that screenshot means?

A    This was some of the corroboration that we had from the CHS that Defendant Robertson had -- was -- had already reached out to and was discussing with the coDefendants about participating in the robbery attempt.

Q    Okay.  And that was the screenshot that Robertson sent to the CS.

A    That's correct.

Q    Okay.  And you already describe Exhibit 4.  What are we seeing in Exhibit 5?

A    Exhibit 5 is -- it's a depiction of when we conducted an identification of Defendant Johnson.  So this is Defendant Johnson in the pre-meeting location prior to the sting on the top.  And on the bottom, as we continued

surveillance, we took photographs of him, including wearing the same sting clothing.

Q    Okay.  And what are we seeing in Exhibit 6?

A    Exhibit 6, sorry.

Q    Yes.

A    This is a screenshot of the video that we recorded as the Defendants approached the location they believed concealed drugs and guns.

Q    Okay.  And which Defendants are depicted there?

A    Defendant Johnson, Defendant Foley, and Defendant Goffney.

Q    And let's go now to Exhibit Number 7.

A    Okay.

Q    What are we seeing there?

A    This is more pictures, screen grabs from the video that were recorded in and around the trailer that they believed contained the narcotics and the weapons.  And depicted here are Defendants Goffney, Foley, and Johnson.

Q    Okay.  And there's some circles in those -- in two of those images.  Can you please clarify why are those image circled?

A    Yes.  Those circles draw the attention to firearms that they were carrying during the robbery attempt.

Q    Okay.  And what about the last exhibit, Exhibit 8?

A    This is when Defendant Johnson and Defendant Stevenson

returned to the location that they had been sent to rob or that they went to go rob.  And they conducted a FaceTime call showing that the contents of the location were empty.

MS. ZENON:  Okay.  Now, Your Honor, we're done with the witness.  Thank you.

THE COURT:  Okay.  Thank you very much.  You may step down, sir.

MR. TABAKMAN:  I apologize, Your Honor.

THE COURT:  Oh, you're -- defense, if you have any additional questions --

MR. TABAKMAN:  Now we do, yes, Your Honor.

THE COURT:  -- ask them.  You got it.  Please.

RECROSS-EXAMINATION

BY MR. TABAKMAN:

Q    Agent, with respect to Exhibit Number 1, you testified that these are the weapons that Mr. Robertson sold to the CS, right?

A    Correct.

Q    And when was that?

(Pause)

A    August 4th.

Q    Okay.  And to your knowledge, Mr. Johnson had nothing to do with these particular weapons, right?

A    Correct.

Q    Now, with respect to Exhibit Number 2, this depicts

Mr. Robertson meeting with the CS, correct?

A    Yes, sir.

Q    And with respect to Exhibit 3, again this is Mr. Robertson communicating with the CS, right?

A    Correct.

Q    Okay.  Neither of these exhibits have Mr. Johnson depicted in them, right, either by text or in picture, right?

A    Correct.

Q    And so at some point in time Mr. Johnson shows up at this particular location, right?

A    Yes.

Q    And when you and I were first talking, you had told me that at some point in time Mr. Johnson was identified some point back in July; do you remember that?

A    Yes.

Q    And you had just testified that Mr. Johnson's phot that's depicted in Exhibit 5 was something that you had utilized in order to identify him, right?

A    For -- yes.

Q    So --

A    As evidence of identification, yes.

Q    Well, so wat what point in time was he identified?  Was he identified here in August or was he identified back in July?

A    Identified as far as being part of the crime or being known to law enforcement?

Q    Being part of the crime.

A    He was identified subsequent to the offense.

Q    Okay.  So back in July you had no reason to believe that he was going to be involved in any of this, right?

A    This specifically.

Q    Yes.

A    No.  We didn't -- I don't think we even had a plan to do this back in July.

Q    Okay.  Well let's talk about that.  So --

        MS. ZENON:  This is the thing, Your Honor, we have another objection.  This is out of the scope --

        THE COURT:  What's the objection?

        MS. ZENON:  Out of the scope, Your Honor, --

        THE COURT:  Okay.

        MS. ZENON:  -- of what he testify in the exhibits.

        THE COURT:  And why is this --

        MR. TABAKMAN:  Well, --

        THE COURT:  -- relevant?

        MR. TABAKMAN:  -- Your Honor, I think it goes directly to whether or not -- one is -- if we're going to talk about risk or danger to the community and how these individuals came together, I think it's important for us to know how this whole entire thing came together to begin

with.

THE COURT:  Okay.  I'm going to give you a little leeway.  But I get the point so let's wrap this up.

MR. TABAKMAN:  Right.

BY MR. TABAKMAN:

Q    So well let's talk a little bit about how this whole thing came together then.  Why don't you tell us how did it come together, whose idea was it?

A    This operation?

Q    Yes.

A    That was the case agent.

Q    Okay.  So what was the objective?  How did the case agent come together to put this whole thing together?  Tell us that.

A    We have known for -- or I have known for a specific period of time that members of this organization have been involved in home invasions and drive-by shootings.

It's reached the level of where I work and my team are made aware of what they're doing.  They became a priority for us to intervene in the violence.

Q    Okay.  And I understand that.  Now, with respect to Mr. Johnson, do you have any specificities as to him being involved in any of what you just described?

A    Other than being part of the organization?

Q    Other than being part of what he's charged with here

today with respect to what happened here, do you have any reason to believe that he was part of anything what you have just described?

A    I don't have any specific knowledge of other crimes that he may have committed.

MR. TABAKMAN:  Okay.  I'll pass the witness, your honor.

THE COURT:  Okay.  Anything else?

MS. MUSICK:  Very briefly, Your Honor.

RECROSS-EXAMINATION

BY MS. MUSICK:

Q    Agent, are you aware that my client, Mr. Foley, was incarcerated since 2017?

A    I don't -- I'm not aware specifically of when he's been incarcerated.

Q    But you did say that this gang or organization came onto your radar since about 2017.

A    They have, yes, on my personal.

Q    Yes.  And but Mr. Foley did not.

A    No.

MS. MUSICK:  I'll pass the witness.

THE COURT:  Okay.  Anything else from the Government?

MS. ZENON:  No, Your Honor.

THE COURT:  Okay.  Agent Bock, you may step down.

Thank you very much.

THE WITNESS:  Sure.

(Witness steps down.)

THE COURT:  Anything further from the Government to present today?

MS. ZENON:  Not actual evidence, Your Honor.  We do have arguments when the Court wans us to present them.

THE COURT:  Okay.  Anything from the Defendants, any proffers or witnesses?

MR. TABAKMAN:  I have two witnesses, Your Honor.

THE COURT:  Okay.  Let's call them.

MR. TABAKMAN:  Thank you.  I'd like to call Melissa Maxie to the stand, please.

THE COURT:  How do you spell it?

MR. TABAKMAN:  Melissa is M-E-L-I-S-S-A, and Maxie is M-A-X-I-E.

THE COURT:  Okay.  Ms. Maxie, if you'd come forward, please, come on up to the witness stand.  If you would raise your right hand, Ms. Maxie.

MELISSA MAXIE, DEFENDANT JOHNSON'S WITNESS, SWORN

THE COURT:  Have a seat, please.

Proceed, counsel.

MR. TABAKMAN:  Thank you, Your Honor.

Good morning, Ms. Maxie.

THE WITNESS:  Good morning.

DIRECT EXAMINATION

BY MR. TABAKMAN:

Q    Ms. Maxie, what is your date of birth?

A    January 23rd, 1984.

THE COURT:  I'm going to need you to move that microphone a little closer, having trouble hearing you. Thank you very much.

THE WITNESS:  Got you.

BY MR. TABAKMAN:

Q    Tell us again when is your date of birth?

A    January 23rd, 1984.

Q    Okay.  And are you currently employed?

A    Yes.

Q    Okay.  And what do you do for a living, ma'am?

A    I'm a lead supervisor.  I work downtown with the homeless at (indiscernible) apartments.

Q    Okay.  And what do you do there specifically?

A    Counseling, housekeeping, security.  I'm a liaison to everything, most things.

Q    Okay.  And what are your work hours right now?

A    So being a supervisor, we have three different shifts. We have a 6:00 to 2:00, 6:00 a.m. to 2:00 p.m., 2:00 p.m. to 10:00 p.m., and a 6:00 -- I mean a 10:00 p.m. to 6:00 a.m., so anywhere around the clock.

Q    And do you know an individual by the name of Kermit

Johnson?

A     Yes, I do.

Q     Okay.  And is he here in the courtroom today?

A     Yes.

Q     Okay.  And how do you know him?

A     It's my fiancé.

Q     And how long have you known Mr. Johnson?

A     I been knowing him since 2009.

Q     You've known him since 2009.

A     Yes.

Q     Okay.  And at some point in time did you and him enter into a dating relationship?

A     Yes.

Q     Okay.  And can you please tell the Court when you first started dating?

A     Two thousand fifteen.

Q     And do you, ma'am, have any children of your own?

A     Do I have any?  I have three children.

Q     Okay.  And how old are they?

A     Seventeen, 16, and 11.

Q     Okay.  And do the -- does the 16 and 11 -- 16-year-old and 11-year-old reside with you at home?

A     Yes, they do.

Q     And is it the same location where Mr. Johnson resides as well?

A    Where he -- yes.

Q    Okay.  How often is he at that location with you guys?

A    Couple a days out of the week.  You know, he's back and forth from mom's house, grandma's house.

Q    Okay.  So his mother and grandmother live in the community as well, here in the greater Houston area, right?

A    Yes.

Q    Okay.  And can you please describe to the Court Mr. Johnson's level of participation in the day-to-day activities of your children's lives?

A    He's our first person.  He takes my son to school, or our son to school.  He takes Mikayla (phonetic) to school. He's helping with homework, he picks them up, he's doing doctor visits pickup.  Like I said, I'm always at work.  So he's the at home mom, as you guys would say, but he's the at-home dad, the best dad.

Q    So is his presence in your environment and your children's environment instrumental to their growth and the stability of your household?

A    Yes.

Q    Now, I'm sure that you likely know Mr. Johnson very well by now.  But are you aware of his history?

A    Yes.

Q    His upbringing?

A    Yes.

Q    Okay.  And at some point in time did Mr. Johnson experience a really big loss in his life?

A    Yes.

Q    And what was that, ma'am?

A    His father died.

Q    Okay.  And when was that?

A    Two thousand and seven.

Q    In 2007.  And do you have any knowledge -- and you don't have to go into detail as far as how that made him feel, but do you have any knowledge as to how it may have impacted his growth and his stability in his life?

A    It puts a burden on anyone when you're there at the time of death and you're holding them in your arms.  So I'm sure it's been traumatic.

Q    Is it your testimony that his father had died in front of him while he was present -- in his presence?

A    Yes.

Q    And since that period of time did Mr. Johnson have to go to seek help both from psychiatric and psychological assistance moving forward in his life?

A    Yes.

Q    And does he still do that to this day?

A    Yes.

Q    Can -- are you -- do you have personal knowledge about his visits with the doctors and how often he does this?

A    Yes.

Q    And how often is he going to the doctor's?

A    The doctor and the psychiatrist I think is probably like every other month.  It just all depends on him.  He can schedule his own appointments more if he needs them.

Q    Okay.  But he willingly and voluntarily participates in the care and helping himself, right?

A    Yes.

Q    Okay.  And are you aware whether or not Mr. Johnson is also on any type of medication due to his psychiatric treatments?

A    Yes.

Q    And does he consistently take those medications in order to help himself?

A    Yes.

Q    Now, let me ask you this as well.  Are you aware as to whether or not Mr. Johnson has his own children?

A    Yes.

Q    And where do they reside?

A    In Oklahoma.

Q    Okay.  And how old are they?

A    I want -- they're in between mine so we have 16 and 15.

Q    Okay.

A    Well, I think one just made 17.

Q    Okay.  So they're Irish twins.

A    (Indiscernible).

Q    Okay.  And did they have a plan to move to the Houston area at some point in time in order to be closer to their father?

A    Yes.

Q    Okay.  And is that plan still in motion?

A    Yes.

Q    Okay.  Now, in the event that Mr. Johnson is released on bond, there will be certain requirements that he's required to participate in.  Are you capable of assisting him in making sure that he is compliant with all the Court orders that are required of him?

A    Yes.  I'm willing to rearrange everything.

        MR. TABAKMAN:  Okay.  I'll pass the witness, Your Honor.

        THE COURT:  Okay.  Anything from the Government?

        MS. ZENON:  Yes, Your Honor.

        Ma'am, good morning.

                    CROSS-EXAMINATION

BY MS. ZENON:

Q    You stated that you had been a relationship with Mr. Johnson since 2015, correct?

A    Fifteen, yes.

Q    Fifteen.

A    Yes.

Q    Yeah.   Therefore, are you aware that on the year 2016 Mr. Johnson was arrested and eventually was placed on probation for multiple offenses?

A    Yes.

Q    And you were in a relationship with him when that happened.

A    Yes.

Q    And you have been in a relationship with him while he has been and is currently on probation for those offenses.

A    Yes.

Q    And those, if you're aware, are violent offenses ranging from robbery to assault; are you aware of that?

A    Yes.

Q    Okay.  And you were in a relationship with Mr. Johnson on August the 7th, 2023, correct?

A    Correct.

Q    In fact, you mentioned -- and please clarify this is correct -- that he's the one that stays in the house because you are always at work.

A    Correct.

Q    Therefore, you -- were you aware of what he was doing on August the 7th, 2023?

A    I don't even know -- I don't know what you mean.

Q    Have no idea, okay.

            THE COURT:  Wait a minute.  I didn't hear the

answer.

THE WITNESS:  I don't know.  I'm not sure --

MS. ZENON:  Okay.

THE WITNESS:  -- what she's asking.

MS. ZENON:  Okay.

THE COURT:  I didn't hear the answer, sorry.

THE WITNESS:  You said was I aware?

MS. ZENON:  Yes.

THE WITNESS:  No, ma'am.

BY MS. ZENON:

Q    You were not aware where he was on that day.

A    He was most likely at home with me, I'm sure.

Q    Okay.

A    He should have been.  I mean, --

Q    He should have been.

A    -- you have to go back to that day --

Q    Okay.

A    -- so you asked me about a day that --

Q    Okay.  However, you clarified that you are rarely in the house and he's the one that takes care of everything.

A    Correct.  Because --

Q    Okay.

A    -- he has to pick me up and drop me off.

Q    Okay.  Are you are aware that if he committed a crime on August the 7th, 2023, he was in violation of his

probation?

A   Okay.  Guess so.

Q   Guess so.  Okay.

MS. ZENON:  We have no additional questions, Your Honor.

THE COURT:  Anything further?

MR. TABAKMAN:  Nothing, Your Honor.

THE COURT:  Okay.  Thank you very much, ma'am. You may step down.  Call your next witness.

(Witness steps down.)

MR. TABAKMAN:  Thank you, Your Honor.  Call Karen Cole Alfred, please.

THE COURT:  Ms. Alfred?

MR. TABAKMAN:  Yes.  Would you like me to spell it, Your Honor?

THE COURT:  Sure.

MR. TABAKMAN:  Karen is K-A-R-E-N, Cole is C-O-L-E, Alfred is A-L-F-R-E-D.

THE COURT:  Come on forward to the witness stand, Ms. Alfred.  Ms. Alfred, would you do me a favor, raise your right hand, please?

KAREN COLE ALFRED, DEFENDANT JOHNSON'S WITNESS, SWORN

THE COURT:  Okay.  Please have a seat.

Counsel proceed.

MR. TABAKMAN:  Thank you, Your Honor.

Good afternoon, Ms. Alfred.

THE WITNESS:  Good afternoon.

DIRECT EXAMINATION

BY MR. TABAKMAN:

Q    Ms. Alfred, how do you know Mr. Johnson?

A    He's my fourth son.

Q    Okay.  And can you please let us know a little bit about your background and -- where did you grown up, ma'am?

A    I was raised -- I was born in Marshall, Texas but I was raised here in Houston.  I been here since I was maybe five.

Q    Okay.  And is Mr. Johnson the youngest of your children?

A    Yes, he is.

Q    Of your birth children.

A    Of my birth children, yes.

Q    Okay.  And tell us what did you do for a living, ma'am? I know that you're currently on disability and retired but what did you do for a living?

A    Before I retired I work at (indiscernible) school district, and then I joined the reserves and went from a reserve to active duty in 2000.

Q    Okay.

A    In 2004 I got called to active duty.

MR. TABAKMAN:  Thank you, ma'am, and thank you for your service.

BY MR. TABAKMAN:

Q    And where did you serve?

A    I serve Kuwait.

Q    Okay.

A    And there for it.

Q    And was that with the U.S. Navy?

A    Yes, sir.

Q    Okay.  And is that why you're currently on disability?  Are there certain events that transpired from your service that led you to retire and ultimately be on disability today?

A    Yes, sir.

Q    Okay.  And with respect to other family members, are there any other family members within Mr. Johnson's family and your family that were active duty military members?

A    Yes, sir.  My stepdad, my -- I have three sons --

Q    Okay.

A    -- that was military.  There -- my dad was Army, I'm Navy, and then I have two sons that are Navy, and then I have another son that's Army.

Q    Okay.  And was his father also -- prior to his passing was he an active duty member of the military as well?

A    He was Army.

Q    Okay.  and currently your other children, are they currently still on active duty or are they all retired from

the military?

A    They're not in the military anymore.

Q    Okay.  Now, tell us your other two -- your other sons' names.  Is it Shannon and Maurice, right?

A    Shannon and Maurice.

Q    Maurice.  And then you had a son named Milton who's deceased, right?

A    Yes.

Q    Okay.  Now, at some point in time was Mr. Johnson residing with Shannon?

A    Yes.

Q    Okay.  And what is that address ma'am; do you know?

A    2907 Warbler Lane, --

Q    Okay.

A    -- W-A-R-B-L-E-R.

Q    Okay.  And are you aware as to whether or not that's the address where Mr. Johnson was arrested?

A    Yes, sir.

Q    Okay.  Now, your son Shannon, what is he currently doing for a living?

A    He's security at the permit office here in Houston downtown.

Q    Okay.  So he's -- is he currently here in downtown Houston?

A    Yes, sir.

Q    Okay.  But he's at work, right?

A    Yes.

Q    Does -- is that why he's not able to be here today?

A    Yes, sir.

Q    Okay.  And in the event that if Mr. Johnson was released, would either Shannon's address or your address be one of the locations where he could reside while this case is pending?

A    Yes, one of three.

Q    Now, I know that you heard Ms. Maxie testify about what had transpired earlier in Mr. Johnson's life and what his history has been like.  Are you also aware of Mr. Johnson's, your son's, medical history and psychiatric history?

A    Yes, sir.

Q    Okay.  And how often are you in contact and in communication with him?

A    Three, four, five days out of the week.  We talk, text message, and plus we talk on the phone and we meet up.  And sometime I leave him at the house and I be gone.

Q    Now, are you currently married?

A    Yes.

Q    Okay.  And what does your husband do?

A    My husband is a pastor of a church.

Q    Okay.  And does he also have children that came into this union?

A    Yes.

Q    Okay.  And they -- and are all of them present and part of your greater family existence frequently?

A    Yes.  We -- they get together as a group and everything but -- the ones that are here.

Q    And is --

A    Two are not here.

Q    I apologize.  And is Mr. Johnson in frequent contact with all of them and participates in family gatherings, events, and part of your family as well in that manner?

A    Yes, sir.

Q    Can you please tell the Court whether or not Mr. Johnson participates in your day-to-day life as well with respect to some type of assistance due to your disabilities?

A    Well, he only just not help me, he helps my mom, too, my mom and my dad and my little sister because they all seniors and disabled.  So he go there, he cleans, and he cleans at my house, help us clean stuff that we can't do, and not much that my mom can do.  But they do -- he go there and clean and run errands.  You know, he helps out.  He's more like our caregiver so --

Q    I understand.

A    Yes, sir.

Q    So you have two elderly parents is what you described,

right?

A    Yes, sir.

Q    And Mr. Johnson is one of the individuals that assists frequently with their care as well.

A    Yes, sir.

Q    Now, I'm sure that you're aware Mr. Johnson has had some issues with the law previously, and he's been in a little bit of trouble and -- well, not a little bit, been in some serious trouble as well.

     Does that lead you to believe that he is not capable of complying with the Court orders or he were to be released, that he would not comply with the orders that the Court sets for him right now?

A    No, sir, it doesn't lead me to believe that he wouldn't do it.

Q    Are you aware that he's currently on probation?

A    Yes, sir.

Q    Okay.  And that due to the fact that he's been currently arrested, that may potentially violate his probation; you understand that?

A    (No audible response.)

Q    Would you do everything in your power in order to assist him through this period of time to make sure that he complies with all Court orders?

A    Yes, sir.

Q    And if the Court were to release him into your custody and care for him to live at your address, would you have the available space for him to reside with you?

A    Yes, sir.  We have a two bedroom, two bath, so he would get the other side of the apartment, yes, sir.

THE COURT:  Let me ask a question because I'm confused.  I thought he lived with you now.

THE WITNESS:  Yes, sir.

MS. SPEAKER:  He does.

THE COURT:  Okay.

THE WITNESS:  He's with me, but he also at my mom's and he stays, you know, (indiscernible) --

THE COURT:  With his brother as well.

THE WITNESS:  He be at our house, he just --

THE COURT:  Okay.

THE WITNESS:  -- goes to all three.

THE COURT:  Got it.

MR. TABAKMAN:  Thank you.

I think what I was trying to say, and, Your Honor, what I'm trying to express is that I would like for there to be one home base to where he's not traveling from home to home to home.

BY MR. TABAKMAN:

Q    And would your home potentially be the one, if the Court were to choose so, to be the one where he stays at

consistently?

A    It's available.

MR. TABAKMAN:  All right.  Thank you.  I'll pass the witness, Your Honor.

THE COURT:  please proceed.

MS. ZENON:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. ZENON:

Q    Ms. Alfred, your son is currently 38 years old, correctly?

A    Yes, ma'am.

Q    Yeah.  And you just mentioned that and responded to questions of the Court that he was living at the moment of his arrest with you, with his brother.  And was he living with his girlfriend, too?

A    The girlfriend stays with my son Shannon.

Q    Okay.  So he was jumping from house to house around the time of his arrest in different homes.  He didn't have a permanent residence.

A    He has a permanent residence.  It's --

Q    Which is?

A    Me.

Q    Okay.

A    But he goes there and help out with my parents.  And then he goes to his girl house because that's where his

girlfriend's at.

Q    Okay.  So when you say --

A    So it's not that -- he's not just jumping from house to house because he has nowhere to stay.  He goes there because he goes there to help my mother when he's needed there.  He goes over there to my brother -- to his brother because that's where his girlfriend is, to visit there.  And he lives basically -- he base -- his base is really at my household, his address.

Q    Okay.  I want to talk about that.  And since when he has lived in your house permanently?

A    He -- last week he was there was I'm going to say it may have been last month but to be sure.

Q    Last month.

A    But he's there.  He comes there, he stays, and he helps me out.

Q    Okay.

A    He helps us out a lot at home.

Q    I want to be more specific then in terms of years.  Has he always lived with you in your house permanently even though he apparently --

A    His permanent base --

Q    -- visits other house.

A    -- with me.

Q    Always.  So he --

A    -- (indiscernible) --

Q    -- was living with you when he was arrested and placed on probation back in 2016.  He was living with you.

A    -- in '16.

Q    He was residing with you --

A    Yeah.

Q    -- when he was arrested for robbery and assault and was later --

A    (Indiscernible).

Q    -- placed on probation.

A    I can't remember.

Q    You can't remember.

A    I want to say he was staying with us.  I have pictures. I'll have to look on my phone.  I write everything down so I have to --

Q    Okay.  You're not sure?

A    -- look at it.  I want to say -- I know he came home with the -- I don't want to say yes and no because --

Q    Okay.

A    -- I have to --

Q    You don't remember if he was living with you.

A    -- I'm almost sure.  He's been staying with -- he reside with me.  I want to say he was with me.

Q    Okay.  So based on your recollection, he was residing with you when he was arrested in 2016.

A       (No audible response.)

Q       Is that your recollection, ma'am, 2016, a couple of years ago, was he residing with you?

        (Pause)

A       Honestly I'm not sure --

Q       Okay.

A       -- because that -- because my mind is saying one thing, but I'm not sure and I don't want to say the wrong thing. I'm not sure because I know he came home to me but on the -- when he got arrested and went to jail, he got arrested at --

        THE COURT:  Okay.  Let's move on.

        MS. ZENON:  Yeah.

BY MS. ZENON:

A       Yeah, I'm not --

Q       And in 2016 --

A       -- I don't want --

Q       -- when he was actually placed on probation and was sentenced, was he then in your house residing while he has been on probation in fact all the way until --

A       Probation --

Q       -- today's date?  He has been residing in your house.

A       Well, he, yeah, paroled to my house.

Q       Yeah.  He has been staying with you.  And you mentioned that he sometimes stays in other homes in your --

A       He goes to other homes.

Q    His brother's home, okay.  Were you aware where your son was on August the 7, 2023?

A    We talked that day because we supposed to --

Q    Were you aware is just that that is --

THE COURT:  Wait, hold on, she's answering --

MS. ZENON:  Yeah?

THE COURT:  -- the question.

MS. ZENON:  Okay.

THE COURT:  You got to let her answer the question.

BY MS. ZENON:

A    We talked that day because it was the day that the Volkswagen was supposed to go in the shop.  And I remember sending him a text of what day because we was -- he was -- we was trying to get the time straightened out.  And Volkswagen can verify that.

And do -- I don't know if we met at mama's that day.  I'm not sure.  But I'm almost sure we met at -- we met up at mama's.  I'm not -- I don't want to tell you no tale.

So I know that we had appointment for Volkswagen that day because I shot him the text of it, the snapshot because we had -- we supposed to been meeting with Volkswagen, have an appointment.  So I don't know exact time and stuff on it but I remember us talking about it that day.

Q    Okay.

A    Because I looked it up on my phone.  I saw the snapshot that I had sent him, --

Q    Okay.

A    -- or the appointment time.

Q    Ma'am, were you aware that on that day he was attempting to commit a robbery while --

A    Ma'am, --

Q    -- armed?

A    No.

Q    Okay.  Were you aware that by committing that attempted robbery he's going to be in violation of his conditions of probation?

A    No.

Q    No.

MS. ZENON:  You have no more questions, Your Honor.

THE COURT:  Okay.  Anything further?

MR. TABAKMAN:  I'll pass the witness, Your Honor.

THE COURT:  Okay.  Thank you very much.  You may step down from the witness stand.

(Witness steps down.)

Any further witnesses or proffers?

MR. TABAKMAN:  No.  I rest, Your Honor.  Just argument.

MS. MUSICK:  Your Honor, we would call for

Mr. Foley Ms. Demetrius Ewing.

THE COURT:  Okay.  Come on up.  And if you tell me how to spell their name, please?

MS. MUSICK:  Yes.  D-E-M-E-T-R-I-U-S, last name E-W-I-N-G.

THE COURT:  Okay.  Ms. Ewing, if you would come on up to the witness stand, please.  If you would, please raise your right hand.

DEMETRIUS EWING, DEFENDANT FOLEY'S WITNESS, SWORN

THE COURT:  Okay.  Please proceed.

MS. MUSICK:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. MUSICK:

Q    Would you state your name for the Record, Ms. Ewing?

A    Demetrius Ewing.

Q    And you are the mother of Martez Foley.

A    Yes.

Q    And have you lived in the Houston area most of your life?

A    Yes.

Q    And has Mr. Foley lived in Houston his entire life?

A    Yes.

Q    And the -- where you live, who lives in your home?

A    Me, my husband, and my son, my youngest son.

Q    And prior to his arrest was Mr. Foley living in your

home as well?

A    Yes.

Q    And how long had Mr. Foley been living in your home?

A    I want to -- about nine or ten months.

Q    Okay.  And is that because he was released from prison --

A    Yes, ma'am.

Q    -- and was paroled to your house?

A    Yes.

Q    And is he able to return to your house?

A    Yes.

Q    You have a four-bedroom home so you have room for him.

A    Yes.

Q    Okay.  And your husband supports that as well.

A    Yes.

Q    And so are you and your husband both in the home daily?

A    Yes.

Q    Okay.  And do you work?

A    I do, yes.

Q    Tell us where you work.

A    HCA Southeast Hospital.

Q    And what do you do at the hospital?

A    Patient care technician unit secretary.

Q    Okay.  And how long have you worked at the hospital?

A    Almost five years.

83

Q    And for the past approximate five to six years just prior to this year was your son, Mr. Foley, incarcerated?

A    Yes.

Q    And so he hasn't had a job in the last five years; --

A    No.

Q    -- is that correct?

A    Correct.

Q    Okay.  Since he's been out on parole has he stayed in your home?

A    Yes.

Q    And has he been -- have you -- are you aware of job searches or attempts to -- for employment for him?

A    Yes.  I helped him get job searches also.

Q    Okay.  So tell us about the most recent.

A    Well, Friday he was supposed to go to the work source to finish the CDL that he was supposed to be getting in the class.  And at my job he filled out a application for Cisco to work in the kitchen, and he had a interview.

Q    Okay.  So when you say on Friday, so this past Friday; is that what you're talking about?

A    Yes.  I'm sorry.

Q    And was that just after your son was arrested on Thursday?

A    Correct.

Q    Okay.  So prior to his arrest you were aware of

schooling and job opportunities that he had set for Friday.

A    Yes.

Q    Okay.  And one of those was to finish getting his CDL?

A    Correct.

Q    And the other was at the hospital where you work.

A    Correct.

Q    And you spoken to anybody at the hospital about your son?

A    Yes.

Q    And had you attempted to get him employment at the hospital?

A    Yes.

Q    Were they aware of his criminal history and the fact that he was on parole and just out of prison?

A    Yes.

Q    And they were still willing to interview him and give him an opportunity.

A    Yes.

Q    And the only reason he didn't follow-up with that interview Friday was because he was incarcerated.

A    Correct.

Q    Are you aware that your son will soon be a father?

A    Yes.

Q    Okay.  And so is that in about two months?

A    Yes, ma'am.

Q    Okay.  And his girlfriend, Ms. Daniels, do you know her?

A    Yes.

Q    Okay.  And how long have they been together?

A    About eight or nine years.

Q    And this is -- they're expecting their first child.

A    Yes.

Q    And --

A    A boy.

Q    -- you're aware that your son has no other children.

A    Correct.

Q    Okay.  And are you aware that his girlfriend, Ms. Daniels, was employed -- has been employed?

A    Yes.

Q    And does she do security guard work?

A    Yes.

Q    And because of her pregnancy has she had to just recently discontinue working?

A    Yes.  She's high risk.

Q    High risk pregnancy?

A    Yes.

Q    Okay.  So she's not employed at the moment but that's just because of the pregnancy.

A    Yes.

Q    Okay.  Was there a plan or have you and your son and

his girlfriend discussed taking care of the child?

A    Yes.

Q    Okay.  What type of plan did you have?

A    For her and the baby to move in so I can take care of them until Martez gets employment.

Q    Okay.  And so as a family you all have worked together to create a plan prior to his incarceration for Martez to get a job, make some money, and be able to support his own child and girlfriend.

A    Yes.

Q    And you would assist them by allowing them to stay in your home.

A    Yes.

Q    Okay.  And you spoke to an officer or somebody from Pretrial Services, correct?

A    Yes.

Q    Okay.  And you told them the same, --

A    Yes.

Q    -- that you would be willing to allow your son Martez back into the home.

A    Yes.

Q    Okay.  And your husband is okay with that as well.

A    Yes.

Q    Okay.  And even though you work fulltime and your husband works, would you be able to monitor and assist to

make sure Martez either stays in the home or goes only to and from work?

A    Yes.  I work three days out of the week so I will be able to.

Q    Okay.  So you're home the other days of the week.

A    Yes.

Q    Okay.  And did the probation department or probation officer talk to about the obligations you might have if you were a third party custodian for your son?

A    Yes.

Q    Okay.  And were those conditions that you were willing to abide by?

A    Yes.

Q    Responsibilities that you would undertake.

A    Yes.

Q    Okay.  And -- one second.  You had told the probation officer that you were aware that your son had used marijuana in the past.

A    Yes.

Q    Is that something that you believe he might need some help for, some treatment of some sort?

A    I mean, treatment wouldn't hurt but, I mean, he don't smoke marijuana every day.

Q    Okay.  So it is something that you were aware of but it's not something that's typically been a problem.

A    Correct.

Q    Okay.  But you do understand that it is illegal.

A    Yes.

Q    Okay.  And it would not be condoned in your home.

A    No.

Q    And if the Court were to send him to some sort of treatment facility or treatment program, would you be supportive of that?

A    Yes.

Q    And would you and your husband and others be able to assist him with transportation to any sort of treatment?

A    Yes.

Q    Okay.  And would you all be able to assist him with transportation to any sort of job that he were to obtain?

A    Yes.

     (Pause)

Q    And outside of you and your husband, does Martez have siblings?

A    He has two.

Q    Two other siblings.

A    Yes.

Q    Okay.  And do they live with you?

A    No, they don't.

Q    Okay.  But does he maintain contact with them?

A    Yes, every day.

Q    So they are present in his life as well.

A    Yes.

Q    So how would you describe Martez's support system?

A    Martez have a strong support system.  He has me, his stepfather, my mother, his sister, his younger brother, and his uncles and his aunts.

Q    Okay.  And when you say younger brother, just to be certain, he's an adult, though, correct?

A    Correct.

Q    Okay.  And in your experience, other than when he was in prison, for these last months that he's been home and out of prison, has he maintained relationships, good relationships with all of your family?

A    Yes.

Q    And would you expect that to continue?

A    Yes.

Q    And probably the hardest question.  If he were released and placed on bond, if you found that he was doing something illegal or was getting into any sort of trouble, would you be willing to report him to this Court or to probation or Pretrial Services as necessary?

A    Sorry, Martez, but yes.

          MS. MUSICK:  I'll pass the witness.

          THE COURT:  Any questions from the Government?

          MS. ZENON:  Yes, Your Honor.

Ma'am, good morning.

CROSS-EXAMINATION

BY MS. ZENON:

Q    Your son is 26 years old, correctly?

A    Yes.

Q    You agree with me that he is a full blown adult, correct?

A    Yes.

Q    Okay.  You mentioned that he was released from prison recently.  When was this?  Do you remember?

A    Don't remember the exact month.  But can I ask my husband?

Q    Was this year?

A    Yes.

Q    Okay.  And he was convicted for the crime for which he was released in 2017; do you remember that, if it was around 2017 that he was convicted?

A    I think somewhere around there.

Q    Yeah.  And at that time he was living with you.

A    Yes.

Q    He was residing with you.

A    Yes.

Q    Okay.  Are you aware that while on conditions imposed by the Court was he was on release, he violated multiple conditions; are you aware of that?

A     Now?

Q     No.  When he was on conditions of release for his prior offense, are you aware he violated multiple conditions?

A     I'm not sure I understand what you're saying.

Q     When he was on release for his prior case, for the case where he was --

THE COURT:  What do you mean he -- when you say he was on release, you mean he was given a deferred adjudication --

MS. ZENON:  Yes, Your Honor.

THE COURT:  -- on the previous case.

MS. ZENON:  Yes.

THE COURT:  He violated terms of the deferred adjudication, --

MS. ZENON:  Yes, Your Honor.

THE COURT:  -- and that's why he was sentenced to prison.

MS. ZENON:  Yes, to prison.  Yes.

THE COURT:  Is that --

MS. ZENON:  Yes, that's what I'm going to.

THE COURT:  Are you aware of that?

MS. ZENON:  Yeah.

THE WITNESS:  Yes.  I mean, --

BY MS. ZENON:

Q     Yes, I guess is.  Are you aware that he violated the --

A    Yes.

Q    -- condition of the first sentence?

A    Yes.

Q    Okay.  And he was residing with you when all that happened.

A    Yes.

Q    Okay.  And you mentioned that he was released this year, and then he end up living with you again.

A    Yes.

Q    Okay.  At all times.

A    Yes.

Q    Okay.  And you mentioned that -- let me go back.

THE COURT:  When was he released?

MS. ZENON:  I'm sorry?

THE COURT:  When was he released?  Does anyone know?

MS. MUSICK:  Your Honor, she testified approximately nine to ten months ago.  My client doesn't remember the exact date but places it in the same timeframe.

THE COURT:  I have a question, and I'm not sure if this is Ms. Ewing or the lawyers.  I noticed in the pretrial report it says that he was charged on 8/7/23 of falsifying a drug test that's pending.  What is --

MS. MUSICK:  That's the arrest in this case.

MS. ZENON:  I was going to go into that, Your

Honor, --

THE COURT:  Okay.

MS. ZENON:  -- with the witness.

THE COURT:  Okay.  Proceed.

MS. ZENON:  Yes.

BY MS. ZENON:

Q    So your son was living with you on August the 7, 2023.

A    Yes.

Q    Are you aware he was arrested on that day?

A    Yes.

Q    Okay.  Are you aware of an individual by the name of Tracy Lee Stevenson?

A    Yes.

Q    Okay.  Is he a friend of your son?

A    They associate.

Q    They associate.  Okay.  And are you aware that during your son's arrest in the vehicle where he was at, the Houston Police Department seized a firearm?

A    Yes.

Q    okay.  And are you aware that on the day of his arrest, your son was charged for having fake urine in order to cheat a drug test at the State level; are you aware of that?

A    Yes.

MS. ZENON:  Oh, you're fully aware of that.

THE COURT:  I don't understand.  What --

THE WITNESS:  Me either.

THE COURT:  -- was the drug test at the State level?  Was he on probation for the -- when he was released from prison?

MS. MUSICK:  Parole.

THE COURT:  Parole.

MS. ZENON:  Yes.

MS. MUSICK:  Yes.

THE COURT:  Okay.  So that was one of the conditions, got it, okay.

Proceed, I'm sorry.

MS. ZENON:  Okay.

BY MS. ZENON:

Q    And all that happen when he was residing with you.

A    Yes.

MS. ZENON:  Yeah.  We have no more questions, Your Honor.

THE COURT:  Anything further from the --

MS. MUSICK:  Very briefly, Your Honor.

                    REDIRECT EXAMINATION

BY MS. MUSICK:

Q    Ma'am, the prosecutor asked you if you were aware there was a firearm when he was arrested with Mr. Stevenson, correct?

A    Yes.

Q    And was your son charged with that firearm?

A    No.

Q    Simply the urine in the car.

A    Yes.

            MS. MUSICK:  Okay.  Pass the witness.

            THE COURT:  Anything further?

                    RECROSS-EXAMINATION

BY MS. ZENON:

Q     Were you aware that your son was in possession of a
firearm on August the 7, 2023 in a prior incident?

A    No.

            MS. ZENON:  Okay.  No, Your Honor.

            THE COURT:  Okay.  Thank you very much, Ms. Ewing.
You may step down from the witness stand.  Appreciate.

        (Witness steps down.)

            THE COURT:  Anything further?

            MS. MUSICK:  And I have nothing further, Your
Honor.

            THE COURT:  Okay.  Anything from Mr. Goffney?

            MR. KAPLAN:  Your Honor, if we could be allowed to
have a temporary recess with regard to the rest of -- being
able to provide any witnesses?  His contact and phone
information for some of the witness is not with him right
now, it's at his dorm.

            If the Court would allow Mr. Goffney to briefly

pause and recess his case until Wednesday to come back and -- and if we haven't the witnesses, I'll let the Court know and whether we can waive the hearing beyond that.

But if possible, if the Court would -- and allow me to get some time to -- we can get his contact information necessary to make witnesses available for this hearing, if possible.

(Pause)

THE COURT:  Okay.  I'm happy to do that.  We'll resume Mr. Goffney at 2:30 p.m. on Wednesday.

MR. KAPLAN:  Yes, sir.

THE COURT:  Okay.

MR. KAPLAN:  Thank you, Your Honor, I appreciate that.

THE COURT:  Anything -- well, it sounds like -- any evidence from anyone else today (indiscernible) obviously with respect to Mr. Goffney, we'll wait until Wednesday on that.

Let's have argument.  So let's focus on Mr. Johnson and Mr. Foley.  I'll let the Government go first.

MS. ZENON:  Court's indulgence, Your Honor.  Let me get the report of Mr. Johnson.

THE COURT:  Let me just ask.  So presumption case, right?

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

MS. ZENON:  Yes, Your Honor.

THE COURT:  And are you seeking Detention based on both the risk of flight and danger to the community?

MS. ZENON:  Yes, Your Honor, we are.

THE COURT:  Okay.  I'm just curious.  Why do you think Johnson -- let's start with Mr. Johnson.  Why is he a risk of flight?

MS. ZENON:  Your Honor, in this particular case we believe that the weight of the evidence against Mr. Johnson is substantial and that it's a factor that the Court needs to evaluate.  In this case, the Defendant was recorded in audio and video --

THE COURT:  I'm with you.  The strength of evidence is strong.  Why is he a risk of flight?

MS. ZENON:  Your Honor, because --

THE COURT:  Is it anything beyond that, hey, he's facing a big prison sentence if he's convicted?

MS. ZENON:  Your Honor, we believe that, first, the fact that he's facing a prison sentence would also, Your Honor, in the case of Mr. Johnson, this is an individual that is currently on probation and had no problem involving himself in new criminal activity that entail carrying a firearm in order to commit a robbery.

And I want to focus the Court on the specific facts of this case.  This individuals were ready not just to

just commit this robbery.  They were ready to confront individuals that would have been at the location.

This individuals -- and I direct the Court to the exhibits -- were fully armed when they arrived to the location and were ready to confront and to fire, if necessary, if --

THE COURT:  Why does that make them a risk of flight?  I'm focusing on risk of flight.  Why is he a risk of flight?

MS. ZENON:  Your Honor, because this is an individual that has probably to commit further and further crimes over and over.  This is an individual that has been convicted first in 2009 for aggravated assault, was paroled.

And then in 2016 for aggravated and robbery and assault, is on probation, and while on probation commits this offense, Your Honor.

We believe that that is directly related to disobeying direct instructions of the Court, Your Honor. And that obviously is directly related to risk of flight.

Committing an offense while on parole is directly disobeying the instructions of the Court, Your Honor.  That is the position of the Government.

We believe that it is strong evidence of potential risk of flight, and that this individual would disobey the instructions of the Court because he had no problem

disobeying the instructions of his probation when he decided to engage in this offense and accept without any problems the invitation.

And in this case, Your Honor, and now obviously we're jumping as to danger to the community, this individual, as well as the others -- so, Your Honor, this arguments obviously is going to be a little bit repetitive as to other Defendants.

But, again, going to the specific facts, this individuals, all of them that were in the room, were directly explain what they were supposed to do, amount of kilos, amount of firearms, that they were going to face confrontation by others.

And after that explanation this individual made the decision to continue to engage in this offense. And we can see him in the video. And obviously we provided screenshots to the Court fully armed, just waiting to confront whoever was going to be in his path in order to complete this robbery, Your Honor.

So we believe that base on the fact that he bluntly violated the conditions of his probation because the weight of the evidence in this case is very strong, this case was recorded on video and audio, the events of this case was recorded through video and audio, and the fact that this Defendant is clearly observe in the video carrying a

firearm, waiting to confront whoever was on his path in order to commit this offense.

Your Honor, we believe that that weight in the Court to make a determination that this individual is certainly a danger to the community.

Your Honor, this individual was offer based on the principal or the guy that coordinated this, Mr. Robertson. He asked for $500. For $500 this individual was willing to do this, for $500. So some serious offense is going somewhere to rob and get 400 firearms, 30 kilos, with a firearm, ready to confront.

So if this individual was willing to do this serious offense for $500, what else he's going to do? You know, if the Court grants him release, it's obvious that his family members have no idea where this individual is at, have no control over him. He's a full blown adult.

His family members obviously had no idea where he was at the time this offense occurred, even though he was on probation and that he was violating his conditions.

So we believe, Your Honor, that both he's a risk of flight and a danger to the community.

THE COURT: Okay. Let me hear from the defense on Mr. Johnson.

MR. TABAKMAN: Thank you, Your Honor.

THE COURT: And focus on the danger to the

community.

MR. TABAKMAN:  Agreed.

(Laughter)

Judge, I understand there's some historical facts and issues with respect to Mr. Johnson that are hard to overcome because he has been in trouble before.

However, what I see in this case is it's pretty evident of an individual, Mr. Robertson, who takes advantage of vulnerable individuals that may have previously been in trouble before, invites them into this concocted idea that the Government comes up with to begin with, and Mr. Johnson here shows up.

First of all, he shows up without a weapon.  They are given weapons when they get there to go do this.  He didn't come there with a gun.

Second of all, I think, Judge, what's most important here is what we heard when the agent testified. There is -- first off, there is absolutely no evidence that he's part of this gang.  There is absolutely no evidence that he's previously known Mr. Robertson, or how long he's known him.

There is absolutely no evidence that he was party of previous crimes with Mr. Robertson nor previous crimes that he had testified about that, well, we know that there's assaults and burglaries and murders.  There's absolutely no

evidence that he's part of any of that activity.

What I see here is Mr. Johnson shows up, he is asked to do something, he is given a weapon, and follows along.

Now, the question is, is he truly a danger to the community?  I think not.  I think that based on the testimony of both of his family members, and based on what we know of him currently being on probation for six years or almost six years, and him soon to be terminated off of that probation, he had no issues on probation.  He had no failed drug test.  He's been complaint.  He's been consistent --

THE COURT:  Well, he had no issues on -- he violated the terms of his probation now, right?

MR. TABAKMAN:  He has currently allegedly violated the terms of the probation, --

THE COURT:  Okay.  And --

MR. TABAKMAN:  -- and I understand that.

THE COURT:  -- that's three years into -- I mean, it's not --

MR. TABAKMAN:  And I understand that we're going to need to address that.  From my understanding, Your Honor, he was going to be early terminated soon based on the fact that he has been consistent with his probation officer.

And we can -- I of course had not had time to confirm that.  And I would have called the probation officer

to testify as we move the hearing for a few days or not.

But my point is, Your Honor, I believe that based on his family's testimony, based on the fact that he genuinely is a person that his family does rely on.

And I understand that the charges are serious. And I understand that there's a very tall mountain to climb here based on what the charges currently are.

However, due to all the unknown circumstances, based on the lack of information that the agent provided for you in order to really assess the level of at least Mr. Johnson's dangerousness, I do not believe that he poses such a threat.

I think that there are conditions that could be placed in order for the Court to be confident that he will not only make every single court appearance, but he will also make very opportunity to better his chances at -- of doing better while he's on bond, addressing the facts and issues in this case very seriously, and continue to be part of his family unit that he has -- that he's so finely tuned to and that he -- that heavily relies on him.

So I would ask that he be released on bond, Your Honor, with very strict conditions that the Court deems necessary.

And he will comply with every single condition, no doubt about it, Your Honor.

THE COURT:  Okay.  Thank --

MS. ZENON:  Your Honor, if I --

THE COURT:  -- you very much.

MS. ZENON:  -- may briefly just there is one matter.

THE COURT:  I'm good.  Okay.

Let me ask.  On Mr. Foley, how do you get over the danger to the community on the defense side?

MS. MUSICK:  I'm sorry.  I thought you --

THE COURT:  Let me just --

MS. MUSICK:  -- were waiting for the Government.

THE COURT:  Let me just start -- let me start -- let me just jump into it.

MS. MUSICK:  Yeah.  Your Honor, Mr. Foley obviously has the prior aggravated robbery in which he was sentenced to prison.

Since he was 18 years old, he's been in jail or prison.  He had a short stent there in '16 where he was on probation and then went to prison in 2017 on a seven-year sentence.

THE COURT:  Let me rephrase it.  I -- let me ask it this way.  Let me cut to the chase, right?

One of the questions I have to ask is, hey, is the person going to comply with the conditions that I impose?

We know that in 2016 he was put on deferred

adjudication, he was given various conditions.  If he complied with the conditions he would not be taken into custody.

He violated the conditions then and then was sentenced to prison.  He spent time in prison.  Got out, was put on probation or --

MS. MUSICK:  Parole.

THE COURT:  Parole.  Violated those conditions allegedly.

So I guess I'm curious.  What confidence do I have that any conditions that I impose would be complied with?

MS. MUSICK:  And that's where I was getting to, Judge.  Other -- his -- in his adult life, he has spent most of that in prison.

He did have a short period where he was on probation when he was I believe 18 or 19 years old.  And then -- and he did not do well.

But -- and at that time he did not have an education, he did not finish high school, he had -- but in prison he completed the GED program that's substantiated in the presentence report.

He also obtained multiple certificates that could help him with employment while he was in prison.

He came out of prison this year an adult.  And, granted, he was an adult as he went in, but he was a very

young adult at age 18.

And about 18 or 19 was the last time he had a chance to prove himself.

He's been on parole for approximately somewhere nine to ten months. And the only alleged violation would be the date of his arrest related to this incident when they just pulled the car over after leaving the scene, and all they found in the car was a bottle of urine that he then admitted he would have used potentially on a urine test for parole.

Granted, that is a misdemeanor. And he was charged with that. He was also released on a $750 surety bond with conditions to appear in court.

He did appear in court. His next court date is not until October the 23rd, so he hasn't had a subsequent appearance. But he did appear, he got his bond, he appeared on his first appearance.

The Court amended those orders to remove pretrial conditions and bond conditions to no longer need urinalysis and drug testing.

And so I think this shows an 18, 19-year-old versus the 26-year-old man you have before you today, and he's had about seven years in prison to sort of change that.

As far as community, he has every tie to this community, his entire family lives here, he's lived here his

entire.  He's --

THE COURT:  I'm with you on that one.

MS. MUSICK:  -- never left.

THE COURT:  There's no risk of flight in my view.

MS. MUSICK:  He's never left.  And he -- the only violation he's had since 2017 is the alleged urine violation.

THE COURT:  And --

MS. MUSICK:  Well, and this offense.

THE COURT:  -- and this offense.

MS. MUSICK:  Yes, this incident, yes.

THE COURT:  Okay.

MS. MUSICK:  But I say, yeah, as far as -- like parole did not have a warrant for him at the time he -- of this.  So he had been doing presumably well on parole, even though it's only been about nine or ten months.

THE COURT:  Got you.  Okay.

From the Government.

MS. ZENON:  Your Honor, our position is that we don't know how the Court can trust an individual that on the same day decides to commit a robbery while armed and also to cheat a drug test of his probation.

Doesn't matter that he admitted it.  On the same day he was willing to go and participate from this robbery, and then he was on his way to cheat a drug test.

We believe, Your Honor, that this individual cannot be trusted, and heavily shows that he's a danger to the community and at risk of disobeying the instructions of the Court.  That's why we believe that he should be detained, Your Honor.

THE COURT:  Okay.  Thank you very much.  Anything else anyone wants to add?

(No audible response.)

Okay.  Well, I greatly appreciate the lawyers on both sides, for the argument and the presentation of evidence today.

Obviously we're here today to determine -- and I'm going to focus -- obviously I'll worry about the -- talk about Mr. Goffney on Wednesday.

But with respect to Mr. Johnson and Mr. Foley, importantly we're here today on the Government's request that you gentleman be detained pending the trial of this case.

And I just want to be clear upfront two things we need to keep in mind that the lawyers I know are well aware of.

First and foremost, you are innocent until proven guilty.  And there's nothing that I say or do here today that affects that presumption.  You are innocent until proven guilty.

I'm simply trying to determine whether you should be held in custody pending the trial of this case.

Second of all, I want to make clear Detention is an exceptional step.  It is the exception, not -- rather than the rule.  I try to do whatever I can to find conditions where Defendants will be released pending the trial of the case.  I do not take this decision lightly at all.

And, you know, under The Bail Reform Act, the question is are there any conditions or combination of conditions that I think I could impose to alleviate the risk of flight or danger to the community.  And if there are any of those conditions, then I need to do that.

Only if there are no conditions, combination of conditions that will reasonably assure your presence at future court proceedings or ensure the safety of society. If there are no conditions, only in that situation may I hold in you in custody pending the trial of this case.

The Government as you've heard is seeking to detain you both on a risk of flight and a danger to the community.

On the risk of flight, the Government has to show whether or not there is a -- whether or not by preponderance of the evidence there are no conditions or combination of conditions that would reasonably assure your presence at

future court proceedings.

Suffice it to say, I don't think the Government has met its burden.  You all have lived here in this area most of your life, and I -- there's nothing that's been presented to me, other than obviously the very serious nature of this crime, that would indicate that you're going to run, that you're going to fee.  So I do not think the Government has met its burden there.

The second question, on danger to the community, the Government actually has a higher burden.  The Government has to show by clear and convincing evidence that there's no conditions or combination of conditions that will reasonably assure the safety of the community.

In this case -- and let me just start with Mr. Johnson.  Mr. Johnson obviously has a criminal record. The pretrial report indicates that in 2009 he was convicted of an aggravated assault with deadly weapon, a felony, confined to seven years at TDCJ.  And then he was paroled.

And then in 2016 there was -- he was convicted, held 60 days' confinement with respect to bodily injury misdemeanor count.

And with respect to an aggravated robbery felony, he was given six years' probation.  That term of probation began on May 13th, 2020.

What's concerning to me obviously is that during

the terms of that probation, about halfway into the probation, that he allegedly committed this crime, seemed to flaunt the conditions that he was put on.

Obviously I note the weight of evidence is strong in this case. There's a lack of stable employment. And, as the Government points out, the current offense which he was charged included apparently a willingness to use a firearm.

Let me say this. His family obviously relies on him. It obviously depends on him. And that's what makes these decisions tough.

But long story short, I think the Government has unquestionably met its burden. I don't think there are any conditions that I could impose given the Defendant's failure to disregard in the past to -- that I could impose either a condition or combination of conditions to ensure the safety of society.

With respect to Mr. Foley, I point out obviously once again you have the criminal record. He was sentenced in 2016.

And by the way, the mere fact that there's a criminal record to me does not mean that someone is a danger to the community. You obviously are sentenced, you serve your time. Hopefully you learn on -- from it, and you move on.

The problem here with Mr. Foley is he was

sentenced in 2016 -- well, got a deferred adjudication.  So if he kept his nose clean and followed the terms, he would not have gone to -- he would not have been held in custody.

The problem was that in October of 2017, there was allegation that he committed not one but many violations, that he failed to comply with four separate conditions, I should say, including a new law offense.

So he then went to prison for seven years.  He got out, he was on parole, and then committed, you know, allegedly this action and then, of course, apparently admitted that he was trying to violate the drug test.

So combined -- and, look, that he was only out -- and this is where the tragedy is.  He was only out for, as we said, nine, ten months.  It's terrible.

But I have no confidence at all that he would not be a danger to society with -- given the lack of stable employment, given his apparently willingness to use a weapon, commit an armed robbery, and that he has violated conditions repeatedly.

I think once again unquestionable the Government has met its burden to show by clear and convincing evidence that Mr. Foley is a danger to the community, and there are no conditions that I could enforce or put into place to alleviate that risk.

So all that said, based on the evidence, the

presentations here today, I am going to find that Mr. Foley and Mr. Johnson should be held in custody pending the trial of this case.

We'll resume with Mr. Goffney at 2:30 p.m. on did I say --

MR. KAPLAN:  On Wednesday, that's correct, Your Honor.

THE COURT:  -- 2:30 Wednesday.  And I guess Mr. Stevenson I think tomorrow.

With all that said, is there anything else we need to address today from the Government?

MS. ZENON:  Not from the Government, Your Honor.

THE COURT:  From the defense.

MR. KAPLAN:  Your Honor, I don't know if you entered discovery orders, if you need waivers of speedy trial, any of that kind of matters before right now.

THE COURT:  No.  I haven't done anything.  I'll let you all proceed with the case.  I think I just took the Arraignment -- took the not guilty pleas seems like a long time ago now.

MR. KAPLAN:  It does.

THE COURT:  But that's what I was trying to remember, did I actually take the -- I did take the not guilty pleas earlier, yes.

Okay.  Thank you all very much.  We'll see you

tomorrow.

And apologize, everyone, for the delay.  But we are off the record.  You may be excused.  Thank you.

(Proceedings adjourned at 12:52 p.m.)

*  *  *  *  *

*I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the proceedings in the above-entitled matter.*

*/S/ MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF*

*ELECTRONIC REPORTERS AND TRANSCRIBERS, CET\*\*337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #68971*

*DATE FILED:  SEPTEMBER 1, 2024*